G. Patrick Watson, Georgia Bar No. 741226
patrick.watson@bryancave.com (*pro hac vice* pending)
Lindsay S. Johnson, Georgia Bar No. 648391
lindsay.johnson@bryancave.com (*pro hac vice* pending)
Thomas S. Lee, California Bar No. 275706
tom.lee@bryancave.com
BRYAN CAVE LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone:    (415) 675-3400
Facsimile:    (415) 675-3434

Attorneys for Plaintiff
HOME DEPOT U.S.A., INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| HOME DEPOT U.S.A., INC. | **Case No. 3:16-cv-04865** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| E.I. DUPONT DE NEMOURS AND COMPANY; HUNTSMAN INTERNATIONAL, LLC; KRONOS WORLDWIDE, INC.; and MILLENNIUM INORGANIC CHEMICALS, INC.; | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1

II. JURISDICTION AND VENUE .............................................................................. 3

III. PARTIES ................................................................................................................. 5

    A. Plaintiff .......................................................................................................... 5

    B. Defendants ..................................................................................................... 5

IV. AGENTS AND CO-CONSPIRATORS ................................................................. 6

V. TRADE AND COMMERCE ................................................................................... 8

VI. FACTUAL ALLEGATIONS .................................................................................. 8

    A. Background Regarding Titanium Dioxide ..................................................... 8

    B. The Titanium Dioxide Industry ................................................................... 10

    C. Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy ............ 13

        1. Industry Conditions Prior to 2002 ................................................... 16

        2. A Paradigm Shift in Industry Behavior ........................................... 18

            a. 2002 Price Increases .......................................................... 20

            b. 2003 Price Increases .......................................................... 21

            c. 2004 Price Increases .......................................................... 22

            d. 2005 Price Increases .......................................................... 24

            e. 2006 Price Increases .......................................................... 26

            f. 2007 Price Increases .......................................................... 26

            g. 2008 Price Increases .......................................................... 27

            h. 2009 Price Increases .......................................................... 31

            i. 2010 Price Increases .......................................................... 32

VII. PLAINTIFF SUFFERED ANTITRUST INJURY ............................................... 36

VIII. PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF

    LIMITATIONS ..................................................................................................... 40

A. The Statute of Limitations Did Not Begin To Run Because Plaintiff Did Not And Could Not Discover The Claims. ...................................................................40

B. Fraudulent Concealment Tolled the Statute of Limitations. ....................................41

IX. ADDITIONAL TOLLING OF STATUTE OF LIMITATIONS ........................................48

X. CLAIMS FOR RELIEF..................................................................................................49

SECOND CLAIM FOR RELIEF Injunctive and Equitable Relief.....................................51

XI. PRAYER FOR RELIEF...................................................................................................52

XII. JURY DEMAND .............................................................................................................53

COMES NOW Plaintiff Home Depot U.S.A., Inc. ("Home Depot" or "Plaintiff"), and states as follows:

## I.    INTRODUCTION

1.    This lawsuit alleges price fixing of Titanium Dioxide, a principal ingredient in a variety of common household products including Architectural Coatings.[1] Many Architectural Coatings are commonly known as house paint. Although Titanium Dioxide is an ingredient in many products, the only product at issue in this case is Architectural Coatings.

2.    Plaintiff is an indirect purchaser of Titanium Dioxide who purchased Titanium Dioxide in Architectural Coatings for its own use as well as for resale during the Conspiracy Period (defined below).

3.    During the Conspiracy Period, Home Depot purchased for its own use billions of dollars of products incorporating Titanium Dioxide made by Defendants and their co-conspirators. Specifically, Home Depot purchased and sold billions of dollars of relevant Titanium Dioxide products during the Conspiracy Period, including purchases made in California and/or for use in Home Depot's California retail store locations and other operations.  Because of the conduct of the Defendants and their co-conspirators, Home Depot paid supra-competitive prices for such products and due to the competitive market in which it operates was unable to fully pass along those overcharges.

4.    By virtue of its purchases, Home Depot has been a member of the putative indirect purchaser class in *Jan Harrison et al. v. E.I. DuPont De Nemours and Company, et al.*, Case No. 5:13-cv-01180-BLF (the "Indirect Case"), which is currently pending in the Northern District of California, from the outset of that action. However, the Third Amended Class Action Complaint, filed on September 29, 2015, narrowed the class definition to exclude purchases for resale, meaning that the bulk of Home Depot's purchases no longer fell within the Indirect Class. Home Depot is

---

[1] ASTM International defines "Architectural Coatings" as follows: "Organic coatings intended for on-site application to interior or exterior surfaces of residential, commercial, institutional, or industrial buildings, in contrast to industrial coatings. They are protective and decorative finishes applied at ambient temperatures." *See* http://www.astm.org/DIGITAL_LIBRARY/MNL/PAGES/MNL12240M.htm (last visited June 29, 2016). "Most are designated for specific uses such as roof coatings, wall paints, or deck finishes." *Id.*

filing this suit to maintain its claims for recovery as to *all* of its purchases regardless of whether they were for resale.

5.      Defendants E.I. DuPont De Nemours and Company ("DuPont"); Huntsman International, LLC ("Huntsman"); Kronos Worldwide, Inc. ("Kronos"); and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively "Defendants") and their co-conspirators are the dominant suppliers of Titanium Dioxide in the United States. Defendants dominate the United States marketplace for this product, a dry chemical powder, which is used in coatings such as paint, cosmetics, plastics, and paper industries. All or virtually all sales of Titanium Dioxide in the United States for production of Architectural Coatings during the Conspiracy Period were made by Defendants. Defendants earn billions of dollars in revenues from these Titanium Dioxide sales.

6.      Plaintiff alleges that Defendants and other unnamed co-conspirators intentionally conspired and agreed to manipulate, fix, raise, maintain, and stabilize the prices at which Titanium Dioxide is sold in the United States. The alleged conspiracy was hatched and implemented in the United States and elsewhere for the purpose of collusively restraining competition, resulting in the overcharging of Plaintiff.

7.      Defendants' unlawful conspiracy was initiated, developed, maintained, and facilitated by a course of anticompetitive conduct, including information exchanges, verbal and tacit agreements, price signaling, secret meetings, and communications between Defendants for the purpose of artificially inflating the price of Titanium Dioxide and allocating shares of the United States market.  In secret discussions and elsewhere, Defendants exchanged commercially sensitive and proprietary information relating to the sales, production, supply, inventory, marketing, and pricing of Titanium Dioxide, as well as the raw materials necessary to manufacture Titanium Dioxide itself. In order to perpetuate this unlawful conspiracy, Defendants and their co-conspirators engaged in fraudulent and deceptive anticompetitive behavior to hide and conceal their behavior from Plaintiff and others.

8.      As a result of Defendants' anticompetitive behavior, the United States marketplace for Titanium Dioxide was controlled and manipulated while prices for Titanium Dioxide were

artificially inflated. Because Plaintiff paid prices for Titanium Dioxide Architectural Coatings that was higher than what would be paid in a competitive marketplace, it suffered economic damages as a result of Defendants' wrongdoing.

9.      Plaintiff purchased Architectural Coatings containing Titanium Dioxide in the United States indirectly from one or more of the named Defendants, their agents, and/or co-conspirators during the period from and including January 1, 2002 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Conspiracy Period"), Plaintiff seeks recovery of actual and/or compensatory damages and to enjoin Defendants and their co-conspirators from engaging in their unlawful and anticompetitive behavior.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).   Plaintiff also brings this action pursuant to the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., for injunctive relief, damages, and restitution. Plaintiff also seeks attorneys' fees, costs, and other expenses under federal and state law.

11.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiff's claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiff's claims arising under state laws under 28 U.S.C. § 1367.  Plaintiff's state law claims are so related to its claims under the federal antitrust laws that they form part of the same case or controversy.

12.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

13.     Assignment to the San Francisco Division is appropriate pursuant to Civil L.R. 3-2(e) because a substantial part of the events that give rise to Home Depot's claims occurred in San Francisco County, California, among other places in this District.

14.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Titanium Dioxide throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

15.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

16.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

17.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Titanium Dioxide, which conspiracy unreasonably restrained trade and adversely affected the market for Titanium Dioxide.

18.     Defendants' conspiracy and wrongdoing described herein adversely affected Plaintiff in the United States including in California.

### III.    PARTIES

#### A.    Plaintiff

19.    Plaintiff Home Depot is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Plaintiff operates over 2,200 retail stores, including well over 200 stores and other facilities throughout California, and is in the business of selling building and home improvement products including paint.

20.    During the Conspiracy Period, Plaintiff regularly purchased for resale Architectural Coatings, containing Titanium Dioxide manufactured by one or more of the Defendants. During the Conspiracy Period, Behr Process Corporation ("Behr") was one of Home Depot's primary vendors of Architectural Coatings. Behr is headquartered at 3400 W. Segerstrom Avenue, Santa Ana, California 92704 and has intermodal and manufacturing facilities in California. Behr purchased Architectural Coatings directly from one or more Defendants.

21.    Home Depot also bought significant amounts of Architectural Coatings from Glidden and other vendors. Plaintiff purchased and/or received some of the aforementioned Architectural Coatings in California. To facilitate its orders of such products, among other things, Home Depot employees regularly dealt with one or more Behr employees based in California. Home Depot made trips to California to evaluate Behr's new products for sale in Home Depot stores. Plaintiff has also displayed, sold, and advertised its Architectural Coatings in California during the Conspiracy Period. Plaintiff has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

#### B.    Defendants

22.    Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Conspiracy Period, DuPont manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States and elsewhere through DuPont or through DuPont's predecessors, affiliates and/or subsidiaries. DuPont is the largest producer and supplier of Titanium Dioxide in the world, and it owns and controls approximately half of the Titanium Dioxide production capacity in North America. DuPont has U.S. manufacturing plants in

Delaware, Florida, Mississippi and Tennessee. DuPont receives billions of dollars in revenues from the production and sale of Titanium Dioxide used in various products marketed and sold throughout the United States directly and through the Internet.

23.     Defendant Huntsman is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. During the relevant times alleged herein, Huntsman manufactured and sold Titanium Dioxide in the United States, which was purchased in the United States, through Huntsman or through Huntsman's predecessors, affiliates, and/or subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct subsidiary of Tioxide Group (a UK company), which is wholly-owned by Huntsman. Huntsman is the fourth largest Titanium Dioxide global producer and has annual sales in the billions of dollars.

24.     Defendant Kronos (formerly known as Kronos, Inc.) is a Delaware corporation with its principal executive offices in Dallas, Texas and its principal North American sales, marketing, and technical offices in Cranbury, New Jersey. Kronos and Huntsman (through a subsidiary, Huntsman Holding, LLC) jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P. (LPC), in Lake Charles, Louisiana. During the relevant time periods alleged herein, Kronos manufactured and sold Titanium Dioxide, which was purchased in the United States through Kronos or through its predecessors, affiliates and/or subsidiaries. Kronos is the fifth largest global producer of Titanium Dioxide and has net sales over a billion dollars.

25.     Defendant Millennium is a Delaware corporation with its principal place of business in Hunt Valley, Maryland. During the relevant time periods alleged herein, Millennium manufactured and sold Titanium Dioxide, which was purchased in the United States. Prior to its acquisition by Cristal in 2007, Millennium comprised the Titanium Dioxide business of Lyondell Chemical Company. During the relevant times alleged herein, Millennium operated plants in Ashtabula, Ohio and Baltimore, Maryland.

## IV.     AGENTS AND CO-CONSPIRATORS

26.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

27.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of some of which are presently unknown to Plaintiff, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

28.     Alleged co-conspirator Lyondell Chemical Company ("Lyondell") is a Delaware corporation with its principal place of business in Houston, Texas. During the relevant time periods alleged herein, Lyondell manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including a wholly-owned subsidiary that is the predecessor of Defendant Millennium. Lyondell acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc. in 2004. In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned over a billion dollars in revenue. Lyondell sold its Titanium Dioxide business (the predecessor of Millennium) to Cristal in 2007. In January 2009, Lyondell and numerous affiliates filed voluntary bankruptcy petitions to restructure under Chapter 11 of the Bankruptcy Code.

29.     Alleged co-conspirator Tronox Inc. ("Tronox") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. During the relevant time periods alleged herein, Tronox manufactured and sold Titanium Dioxide to indirect purchasers in the United States through itself or through its predecessors, affiliates and/or subsidiaries. Tronox is the world's third largest producer of Titanium Dioxide. In 2006, Tronox earned hundreds of millions of dollars in net sales of Titanium Dioxide in the United States. It owns plants in Hamilton, Mississippi and Savannah, Georgia. Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation and was acquired by Anadarko Petroleum Corporation in 2006. In January 2009, Tronox and certain of its subsidiaries filed voluntary petitions to restructure under Chapter 11 of the United States Bankruptcy Code.

30.     Alleged co-conspirator International Business Management Associates, Inc. ("IBMA") is a Delaware corporation, and its principal place of business is believed to be in

Plainsboro, New Jersey. Alleged co-conspirator James R. Fisher is the President and Chief Executive Officer of IBMA and has held this role at all relevant times. IBMA is Mr. Fisher's alter ego. Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years, including before and during the relevant time periods alleged herein. Prior to working as a consultant to the industry, he was employed by Defendant Kronos. Mr. Fisher was a main actor and perpetuator of the sharing of nonpublic, commercially sensitive information concerning Titanium Dioxide between and among Defendants and their co-conspirators. He has also been an agent and co-conspirator of one or more Defendants.

31.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

32.     Defendants are liable for unlawful acts performed in furtherance of the alleged anticompetitive price-fixing conspiracy by companies acquired through mergers and acquisitions.

## V.     TRADE AND COMMERCE

33.     During the relevant time periods alleged in this Complaint, the Defendants and co-conspirators engaged in anticompetitive and unlawful conduct and control of the Titanium Dioxide market affecting trade and commerce throughout the fifty (50) states, including in California and this judicial district.

## VI.     FACTUAL ALLEGATIONS

### A.     Background Regarding Titanium Dioxide

34.     Titanium Dioxide is a dry chemical powder that is primarily used as a white pigment. It is the world's most widely used pigment for whiteness, brightness, and masking of colors in paints and coatings purchased by Plaintiff and others. Titanium Dioxide is consumed in 170 countries and is one of the most important inorganic chemicals used in the production of goods.

Titanium Dioxide is considered very valuable in markets such as the United States, and its use in consumer goods increases the quality of life for consumers.

35.     Titanium Dioxide traps and reflects light better than almost any known substance. The majority (approximately 55 percent) of Titanium Dioxide is consumed in the United States in the paint and coatings industries. In 2008, Architectural Coatings accounted for approximately 41 percent of all Titanium Dioxide consumption in the United States. It is nonflammable and nontoxic and has replaced lead compounds in residential paints. Although the primary function of Titanium Dioxide is to whiten or brighten paint, paper, and plastic, the chemical is also used in synthetic fiber production and to make inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, ceramic, and other products.

36.     There are no viable white pigment competitive substitutes for Titanium Dioxide in consumer products. Because Titanium Dioxide's masking or opacifying ability is very unique, there is no technical substitute for the product. Titanium Dioxide also has great resistance to other chemicals and ultraviolet degradation and has very good heat stability. Even though Titanium Dioxide's artificially inflated and supra-competitive prices are manipulated and unconscionably high, competitors have difficulty entering into and competing in the consumer goods market. Thus, Plaintiff has had no alternative but to pay the unfairly fixed and maintained prices set by Defendants.

37.     Titanium is the ninth most abundant element in the Earth's crust. It is typically found along with iron in a mineral oxide called ilmenite and also in a less common ore called rutile. The majority of titanium production is used to make Titanium Dioxide. The Titanium Dioxide manufactured for commercial use is derived from the mining of ilmenite and rutile. Manufacturers typically sell Titanium Dioxide in powder form after mining it and separating it from titanium ore.

38.     Titanium Dioxide is manufactured using two different processes, sulphate and chloride, which create two crystal forms, rutile and anatase. The sulphate process uses concentrated sulfuric acid to extract Titanium Dioxide from ilmenite or titanium slag. The chloride process uses

petroleum coke to convert rutile to titanium tetrachloride, which is then converted into Titanium Dioxide through contact with superheated oxygen or air.

39. Most Titanium Dioxide plants utilize the chloride manufacturing process because, among other advantages, it generates less waste. Defendants and their co-conspirators operate most of the chloride process plants in the world. Although both the sulphate and chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process produces the anatase form, which is less durable than rutile. Anatase is preferred in food, drug and cosmetic products. The rutile form of Titanium Dioxide fulfills more than 80 percent of the world's requirements for Titanium Dioxide. After Tronox's predecessor, Kerr-McGee, closed its sulphate process plant in 2004, only the chloride process has been used to produce Titanium Dioxide in the United States.

40. Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide. Titanium Dioxide grades feature degrees of brightness and whiteness, and most are made by adjusting the size of the Titanium Dioxide particles. Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and a coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

**B. The Titanium Dioxide Industry**

41. Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers. Accordingly, buyers make purchase decisions based largely, if not entirely, on price, which made it easier for Defendants and their co-conspirators to reach agreement on prices and to monitor each other's compliance with the agreements.

42. All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80 percent of Titanium Dioxide sales, and which are sold primarily to United States customers in the paint, coatings, and plastic industries. All Defendants except for DuPont make and sell anatase grades. The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase. Generally speaking, rutile grades are preferred for outdoor uses

by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries. Both rutile and anatase grades are sold to fine paper and paperboard customers in the paper industry for use as a filler and in coatings. Approximately 90 to 95 percent of Titanium Dioxide annual sales are made to customers in the coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to customers in these industries.

43.     During the relevant times alleged herein, Defendants and their co-conspirators dominated and controlled the Titanium Dioxide market in the United States. Defendants and their co-conspirators control 100 percent of the United States' Titanium Dioxide capacity and 65.5 percent of all imports.[2] Thus, Defendants account for approximately 92 percent of all United States consumption of Titanium Dioxide. The remaining eight percent is unsuitable for and not used in the production of Architectural Coatings. Because of this market domination, Defendants and their co-conspirators are able to engage in unfair and anticompetitive behavior, overcharging consumers of paints, cosmetics, and plastics in the United States.

44.     The Titanium Dioxide industry has high barriers to entry. For example, a new "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately $450 to $500 million and require a three to five year lead time to build. Defendants also have cost advantages and proprietary technologies that effectively deter new entrants. Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and maintain the high concentration of the Titanium Dioxide industry.

45.     Titanium Dioxide producers, including Defendants, face similar costs. Because Defendants face similar costs, their pricing preferences tend to be aligned. This alignment and unity of interest make it much easier for them to agree to and defend an agreement on price increases, thus manipulating the Titanium Dioxide market capacity and control of supply. The manipulation

---

[2] The largest non-defendant source of Titanium Dioxide in the United States is from China. However, Chinese imports of Titanium Dioxide are not used in the production of Architectural Coatings because of the low quality of the Chinese product. In fact, Chinese manufacturers actually import rutile-based Titanium Dioxide from the United States and other countries to be used in paint because of the low quality of the domestic Titanium Dioxide.

of the production and supply further creates the opportunity for an unlawful uniform conspiracy to artificially inflate the price charged for Titanium Dioxide, which is passed on to purchasers of products containing Titanium Dioxide such as paint, cosmetics, and plastics.

46. In and around 2005, allegedly to reduce the costs of importing Titanium Dioxide manufactured abroad into North America, Huntsman purportedly reduced its sales (and, presumably, its market share) in North America. Nevertheless, Defendants' domestic and global market shares remained relatively stable during the relevant times alleged herein. For example, even though DuPont's Titanium Dioxide plant in DeLisle, Mississippi was shut down by Hurricane Katrina in August 2005 and did not even begin a phased-in production until January 2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of price increases and increasing demand for Titanium Dioxide in the United States. Indeed, sales volumes in DuPont's Coatings and Color Technologies segment (of which Titanium Dioxide sales are a part) declined only 3 percent from 2004 to 2005, while sales revenues were up 3 percent.

47. Because Titanium Dioxide is an essential (non-substitutable) element in the production of consumer goods, demand for the product is inelastic: *i.e.*, the loss in sales volume from a Titanium Dioxide price increase is small relative to the magnitude of the price increase itself.

48. The Titanium Dioxide industry in the United States presents strong characteristics favoring creation of an unlawful pricing cartel. The industry is highly concentrated with the vast majority of the world's capacity concentrated in the few Defendants and involves the sale of a homogenous commodity product, for which there is inelastic demand. Couple this inelastic demand with the industry's high barriers to entry, and the concomitant opportunity to collude, cooperate, and conspire regarding the pricing for Titanium Dioxide supply and output is particularly favorable. This is especially true given that the vast majority of the world's capacity for production of Titanium Dioxide is concentrated in these few Defendants. During the Conspiracy Period, the market shares remained relatively stable with estimated shares of around 30% for DuPont, 10% for

Huntsman, 16-20% for Kronos, and 20% for Millennium. Indeed, the Defendants have exploited this opportunity, adversely affecting Plaintiff.

49.     Titanium Dioxide market characteristics that indicate collusive behavior include very similar, quickly followed, and obviously coordinated price increase announcements, the existence of joint venture agreements among cartel members and static or declining demand, which encourages those in collusion to coordinate supply restraint and/or reduction and prevent downward price competition. Moreover, many of these factors make it easier for each Defendant to monitor one another's compliance with an agreement to artificially inflate or stabilize prices, putting each at a higher risk of retaliatory action and enforcement from those who choose not to disrupt the unlawful agreement and restraint of trade.

50.     Industries like the Titanium Dioxide industry, with few sellers facing similar costs, low substitutability, competition primarily based on price, and high barriers to entry are particularly susceptible to price collusion. Succinctly stated, the Titanium Dioxide industry bore in 2002 all of the characteristics of a price-fixing cartel waiting to happen. This set the stage for an unlawful conspiracy to manipulate, fix, maintain, and stabilize the price of Titanium Dioxide which began to impact industry pricing in January 2002.

**C.     Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy**

51.     Defendants' joint ventures, transactions, trade association activity, use of common consultants, deals, and agreements afforded them opportunities to discuss pricing, capacity, cost, customer, and other nonpublic, commercially sensitive issues, which they utilized. Defendants engaged in coordinated pricing activity as early as January 2002 and thereafter in furtherance of their unlawful, ongoing conspiracy. In the absence of such an overriding price raising and/or price stabilization agreement and understanding among Defendants, it would have been contrary to the independent economic self-interest of each Defendant to allow its competitors access to information about each other's pricing, supply, capacity, utilization, and output.

52.     Defendants and their affiliates produce and sell raw materials to each other. For example, Defendants Kronos, Millennium, and their affiliates sell raw materials, such as ilmenite

ore, to other Titanium Dioxide producers. In 2007, Millennium purchased Titanium Dioxide from DuPont for eighty-eight cents per pound, while the lowest price paid by any other purchaser at that time was nine cents higher. Defendants also engage in other business transactions with each other, including sales of Titanium Dioxide between Defendants (as opposed to selling the product to customers of another Defendant or co-conspirator).

53. Defendants Huntsman and Kronos' joint Titanium Dioxide manufacturing venture, LPC, facilitated the conspiracy by giving the two competitors opportunities to collude. For example, Huntsman agreed to reduce inventory in 2002 following the release of a monthly report by LPC indicating that it reduced production as a result of the partners' wishes due to high stocks. Kronos's and DuPont's cross-license patents to make certain Titanium Dioxide grades are also examples of opportunities to collude and conspire.

54. Defendants swapped Titanium Dioxide with each other, sold Titanium Dioxide to each other (including at discounts off of "market price"), sold ore and other raw materials to each other, swapped raw materials with each other, occasionally considered purchasing each other, and—to borrow a word that one senior executive coined in an email to his high-level colleagues at Cristal/Millennium—engaged in "co-opertition."

55. The mutually beneficial nature of the business relations between Defendants provided not only the opportunity to conspire, but also a financial incentive to do so. The more that Defendants came to deal with and rely on each other, the more incented they were to maintain market stability, to agree on and support price increases, and to avoid competing on price for the business of each other's customers. Defendants' meetings and communications, which occurred during the relevant times alleged herein and are detailed below, fostered cooperation, eliminated competition, and permitted the unlawful price-fixing conspiracy.

56. Defendants' conspiracy was monitored and policed by communications not only among Defendants themselves, but also between Defendants and industry consultants, customers, and others, as well as through public sources like *Chemical Week*, the *Chemical Market Reporter* (now ICIS), and Defendants' websites. For example, in advance of the effective date of a price

increase, Defendants routinely sent price increase announcement letters to customers being served by other producers, conditioning the market to accept a price increase by the effective date. This conduct maximized the transparency in the market of Defendants' collective willingness to increase prices and discouraged price competition or "cheating" on the price increase. After having reached an unlawful agreement or understanding as alleged herein, Defendants used consultants, customers, and others as conduits to confirm intended pricing and other actions with each other.

57.     During the Conspiracy Period, when Defendants met and spoke with each other, they were always in the process of trying to increase Titanium Dioxide prices. Indeed, the facts reveal that Defendants and co-conspirators regularly and routinely met and spoke with each other *before* price increase announcements; *during* the period of time after an industry increase had been announced but before it became effective; and *after* the effective dates of price increases, when Defendants and co-conspirators were in the process of implementing the increases for all of their customer accounts.

58.     Like their other business meetings, trade association functions provided Defendants with the opportunity to discuss prices and support for price increases, as well as capacity and cost issues. Defendants engaged in such private discussions with each other at dinner meetings before and during trade association and other business meetings. For example, Defendants are all members of the American Chemistry Council's Titanium Dioxide Panel. Although the timing and frequency of the meetings of the Panel are not fixed, annual American Chemistry Council meetings are held in June at the Greenbrier in White Sulfur Springs, West Virginia, and these were attended by Defendants' top executives. Defendants are also members of the Titanium Dioxide Stewardship Council, which was formed as a U.S. industry trade group ostensibly focusing on safety, health, and environmental issues. Defendants also met and spoke with each other at bi-annual (odd year) InterchPira Titanium Dioxide conferences and at bi-annual (even year) meetings and exhibitions of the Industrial Minerals International Congress, annual meetings of the U.S.-based National Paint and Coatings Association, and other associations related to their industry and customers. Finally, Defendants are all members of the Titanium Dioxide Manufacturers Association (TDMA), which

conducts annual and other meetings and is associated with the European Chemical Industry Council (CEFIC). Eighty-eight percent of price increase announcements by Defendants came within thirty days of their attendance at TDMA General Council meetings.

59.     Defendants' contacts also fostered industry discipline in maintaining and effectively allocating customer positions and market shares. The numerous meetings and contacts (both bi-lateral and multi-lateral) between Defendants and co-conspirators typically coincided with simultaneous industry price increase announcements.

60.     In addition to prices, costs, and customers, Defendants also discussed capacity issues. Their discussions helped them reach consensus on the need to restrain Titanium Dioxide capacity expansion, which restraint they knew would help stabilize prices and support price increases despite industry overcapacity. Defendants monitored each other's capacity plans, including plant closures, "debottleneckings," and "brownfield" capacity expansion through the improvement of production efficiencies at existing facilities.

61.     Defendants were generally aware of each other's inventory levels and operating rates. Defendants understood that industry expansion needed to occur in a "disciplined" way, i.e., in a manner that sought to eliminate—or at least minimize—the potentially negative pricing impact of capacity expansion. At times during the Conspiracy Period, Defendants wanted the industry to appear to be "tight" on product (regardless of whether demand was weak or strong), so that industry overcapacity did not cause prices to decline like it did in the mid-1990s.

62.     Defendants' discussions about capacity issues had their intended effect. None of the capacity increase announcements made during the Conspiracy Period, including increases planned by DuPont to cover the industry's annual growth, decreased prices. For example, within weeks after DuPont's announcement of its intent to build an enormous plant in China, Defendants announced price increases in North America and worldwide. These price increases were a success.

### 1.     Industry Conditions Prior to 2002

63.     During the 1990s, on account of factors including vigorous price competition, global overcapacity, and customer consolidation, Titanium Dioxide prices trended downward, with the profitability of Titanium Dioxide manufacturers reaching an all-time low in 1996.

64.     The Titanium Dioxide business of Imperial Chemical Industries also went up for sale, and it was eventually sold to Huntsman in 1999 for $2.8 billion. Although industry consolidation and other factors helped industry prices and margins improve by the year 2000 from their 1996 lows, poor economic conditions (*e.g.*, those following the events of September 11, 2001), declining demand, and increased global customer purchasing power severely eroded prices in 2001.

65.     Demand in 2001 decreased to the point that Defendant Millennium idled one of its U.S. plants effective September 1, 2001, informing customers that they would not be impacted because other plants could still supply them. By the end of 2001, average U.S. prices of Titanium Dioxide purportedly had reached their lowest level in current dollars since 1991.

66.     For example, according to a chart within Huntsman's Marketing Strategy for 2001-2006 (dated August 2001), the "real" price of Titanium Dioxide per ton, in "Real 2000 US$," was approximately $3200 in 1991, but only $1900 in 2000: a 41 percent decline. As a Millennium strategy report dated in April 2003 put it, over the previous decade, the "maturing" Titanium Dioxide industry's "profitability ha[d] declined[,] driven by overcapacity and a decline in real prices (negative 3.4-percent CAGR)." Similarly, in April 1999, Kerr-McGee's Senior Vice President, Peter Woodward, gave the keynote address at an Intertech Titanium Dioxide conference in Padova, Italy, stating in part: "[T]his industry has been giving up price during most of the decade. This trend of declining prices moved faster than the industry's ability to control its costs."

67.     Overcapacity and decreasing prices led to a "restructuring" of the industry in the 1990s. Rhone Poulenc sold its Titanium Dioxide business to Millennium, Bayer "sold 80% [of its] European business to Kerr-McGee," and ICI sold its "Tioxide" Titanium Dioxide business to Huntsman, which then entered the industry at that time. KMG's Woodward even warned Intertech

conference attendees in Padova of his belief that, "Tioxide, without DuPont ownership, would be a negative factor on price."

### 2. *A Paradigm Shift in Industry Behavior*

68.     As a result of abysmal industry conditions in 2001, Defendants were motivated to reach, and did reach, an agreement or understanding to act together to increase prices and improve margins in the industry. Millennium, for example, created a presentation entitled "Strategic Planning Presentation" that included a slide titled "TiO2 Industry Trends" for the September 2001 meeting of TDMA. One such "Trend" was "[p]ossibly more discipline on pricing and capacity."

69.     Prior to 2002, DuPont was not a member of TDMA. That was corrected at the TDMA General Committee meeting on January 24, 2002, in Saariselka, Finland when TDMA's existing members agreed to change its rules and to expand its already-limited membership to include the world's largest producer and price leader, DuPont. DuPont's "associate membership" in the TDMA, however, was conditioned on its agreement to participate in a new, Global Statistics Program (GSP).   The GSP would involve monthly reporting by its members of the previous month's sales production, and inventory figures and consolidation by CEFIC of that information into a report e-mailed back to TDMA members. Finally, TDMA's members agreed to a one-time exchange of historical data for the years 2000 through 2002. This allowed TDMA's members to estimate their own market shares and their ostensible competitors' shares, inventories, and production on a virtually real-time basis.

70.     Millennium's David Vercollone encouraged creation of the GSP, writing to his Millennium colleagues on April 17, 2002 that the program was "an important effort for us to get the industry to make more informed decisions" and "the best opportunity we have in structuring industry data for all our collective needs." Vercollone's uses of the terms "we," "our," and "collective" suggest benefits to all Defendants and their co-conspirators rather than simply Millennium.

71.     James Fisher, a well known consultant in the Titanium Dioxide industry and the President and Chief Executive Officer of International Business Management Associates, Inc., also

recommended that pigment producers "more carefully monitor trends in end-use sectors and trends in demand for end-use products" in an editorial he wrote for a pigment industry newsletter called "TiO2 Worldwide Update" during this time frame. Fisher also advised all Defendants that it was "critical for producers to have accurate information about their success in the market as well as knowing share positions of their competitors for sales as well as for inventory levels." Fisher would act as a conduit for Defendants throughout their conspiracy.

72.    The details of these information exchanges were finalized and agreed upon at TDMA's September 2002 meeting and became operational in October 2002. Defendants and their co-conspirators treated the information as being highly confidential and instructed any person that was given access not share it with any other parties, including other employees of their companies.

73.    Once DuPont joined TDMA and members began contributing to the Global Statistics Program, Defendants' and their co-conspirators' behavior in the market immediately changed. Beginning in or around early 2002, increases were announced and implemented despite flat demand, decreasing raw material costs, and excess capacity in the industry. Defendants' cooperative conduct and achieving of consensus not to resist price increases caused customers to pay higher prices for Titanium Dioxide during the Conspiracy Period than they would have paid in a competitive market.

74.    Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had the largest U.S. and world Titanium Dioxide market share, usually led industry price increases during the Conspiracy Period. Defendants routinely matched the amount and typically the effective date of each other's price increase announcements during the Conspiracy Period. Defendants also usually justified price increases on the same grounds, whether in written announcements or in discussions with customers.

75.    It is logical to assume that prior to these price increases, Defendants communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such as through industry analysts, consultants, or others) and reached an understanding or agreement to support increases in industry prices. Defendants' price-fixing agreement or understanding was reached in secret, so

Plaintiff does not presently know the precise circumstances surrounding its formation. However, the facts indicate that this understanding or agreement was maintained and fostered throughout the Conspiracy Period by means of other communications, which led to numerous additional price increases and relatively stable customer positions and market shares. Defendants' communications were conducted surreptitiously.

### a. 2002 Price Increases

76. On January 7, 2002, Dave Young of DuPont emailed his colleagues regarding alternative price increase announcement strategies. He wrote that an announcement on "January 24, effective February 15" – as opposed to the alternative of "February 4, effective March 1" – "could give our competitors a change [sic] to announce 'differently' on March 1." DuPont was admitted to TDMA only a few weeks later.

77. Less than a week after TDMA's January 2002 meeting in Finland and in spite of flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and their co-conspirators announced similar price increases worldwide, including a $0.05 per pound increase in the United States, to be effective March 1, 2002. This immediately preceded the seasonal demand peak period of April to June and the annual Industrial Minerals International Congress Exhibition held in Paris, France in April 2002. At the time this exhibition was held in Paris, Defendants were still in the process of increasing prices to their customers globally, in part because the largest customers typically buy Titanium Dioxide under contracts that contain price protection clauses, which defer the effective date of an increase until several months after the increase announcement. The first known increases of the Titanium Dioxide cartel were successful.

78. After Defendants' announcements of the early 2002 price increases, but several weeks before their effective date of March 1, 2002, a chemical and oil industry news service published an article on February 11, 2002 entitled "Ti02 Producers Seek Large Price Increases As Profitability Hovers Near Break-Even Point." The article noted that support for the worldwide increases "appears unanimous" and it predicted further increases if demand recovered in the next few months. The article quoted an industry analyst, James Fisher of IBMA, as stating, "Every

producer is hurting. They all need to get prices up." The article continued, "Producers concede that buyers may question the increases because of last year's falloff in demand, but they stress that the increases are necessary to rebuild margins." The article also quoted high-level executives from Defendants DuPont (Ian Edwards, Global Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the Global Coatings Business), and Huntsman (Stuart Heyes, Vice President of NAFTA Sales) commenting on industry prices, margins, consumption, and demand.

79.     In May 2002, Joe Maas of Kronos stated in an e-mail to Fisher "that he had heard Huntsman announced a price increase of '150$/mt???!!!'" "It sounds weird to me," wrote Maas, "[c]an you confirm anything from your lofty position??"

80.     On June 7, 2002, several days before DuPont's June 11, 2002 price increase announcement Connie Hubbard, DuPont's Competitive Intelligence Manager, spoke with Fisher. A week later, she made a note in DuPont's "Competitive Intelligence" database that Fisher had called her to confirm that Huntsman had announced a "$150/T increase" in North America. Hubbard wrote that "[a]s this call came before the DuPont announcement, [she] told [Fisher] that [she] had not seen any press release or announcement on Huntsman (or DuPont) and asked him his source."

81.     In July 2002, shortly after the communications between Hubbard and Fisher, Defendants announced price increases worldwide again. DuPont led the charge with a price increase of $0.06, to be effective on July 1, 2002. Millennium and Kronos followed suit three days later, Huntsman announced an identical price increase two weeks later, and Tronox joined in effective August 1, 2002. A few months later, in and around September 2002, a U.S. price increase of $0.04 per pound for other grades sold to the paper industry was announced.

**b.      2003 Price Increases**

82.     Defendants also increased prices in 2003 despite a decline in global demand and 85 percent industry capacity utilization. Kronos, DuPont, and Huntsman led a $0.06 per pound price increase announcement in January 2003, which Tronox followed two weeks later. Then DuPont led a second $0.06 per pound increase in September 2003, which the remaining Defendants followed

within 20 days. In all, the North American annual average price per ton of Titanium Dioxide (including cost of goods, insurance, and freight) increased by 4 percent from 2002 to 2003, going from $1,753 to $1,830.

83.     In the midst of the January and February 2003 price increase announcements, a Titanium Dioxide conference was held in Miami, Florida. It was attended by Defendants and their co-conspirators who, it is believed and alleged, discussed and came to price agreements at or around the same time. DuPont's Global Business Director (Ian Edwards, who gave the keynote address), as well as a former Vice President of Defendant Millennium (Bruce Zwicker), told conference attendees to expect further price increases. Mr. Edwards's speech, entitled "TiO2 - Graceful Maturation of Spirited Rejuvenation" included slides that stated, among other things, "Cost is a beautiful thing to have as an advantage - but is of limited benefit if it's all given away." Mr. Edwards later told another DuPont executive that his goal was "to stress the need for the TiO2 industry to get its financial house in order" and that "verbally at the conference [he] was more direct." His speech coincided with the February 2003 price increase announcements described above.

84.     On July 31, 2003, Gary Cianfichi of Millennium sent an e-mail to his colleagues John Hall and Rick Rowe to report that Millennium had decided to "stop our US TiO2 statistics reporting to the [Department of Commerce]" in order "not to telegraph a possible US TiO2 inventory buildup by us and others." More tellingly though, Mr. Cianfichi ended the e-mail, "PS – John – also note that Bob asked me to talk to Fisher to ask him to do a little job for us – ascertain relative TiO2 inventory levels for some of our key competitors. A little task but I'll speak to Jim this week on this."

### c.     2004 Price Increases

85.     Defendants announced price increases four times in 2004, though DuPont was not always the leader (as it was in 2002 and 2003). There was a U.S. price increase of $0.05 per pound for all grades effective March 15, 2004; a U.S. increase of $0.04 per pound for all grades effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman) or July 1, 2004 (Kronos); a price increase

COMPLAINT
PGDOCS\6589483.3

of $0.03 to $0.07 per pound, depending on grade, effective October 1, 2004; and a $0.06 per pound increase for all grades effective January 1, 2005. Overall, the North American annual average price per ton of Titanium Dioxide increased by 5 percent (from $1,830 to $1,921) from 2003 to 2004.

86.     Again, Defendants and their co-conspirators had ample opportunities to conspire and agree to the increases. At an Industrial Minerals International Congress conference in Barcelona, Spain held in the last few days of March 2004, a Senior Vice President of Huntsman gave a presentation about Titanium Dioxide industry prices and price dynamics. It was a timely speech because Defendants were in the process of increasing prices, described above, to customers, and Defendants and their co-conspirators in attendance at the conference were able to discuss and come to price agreements at or around the same time.

87.     On August 25, 2004, Millennium's European sales director Tim Edwards sent an email to Gary Cianfichi instructing that the October 1 announcement date was "a bit early" and that an announcement on November 1 would give "others [a] chance to get on their horses."

88.     Millennium's Chief Executive Officer Bob Lee, Millennium's Deputy General Counsel and Director of Corporate Development, Huntsman's President Tom Keenan, and Huntsman Vice President Mahomed Maiter met in Baltimore, Maryland on September 13, 2004. The next day, Millennium's Cianfichi sent an e-mail to colleagues, stating "**now that we have competition on board for the Oct 1 price increase announcement**, please relook at your agents['] commissions."

89.     In addition, Defendants were able to monitor each other's conduct both in the United States and worldwide beginning in May 2004 through their support of, and data contributions to, TZ Minerals International's (TZMI) *TiO2 Review*, a publication that, during the relevant time period alleged herein, provided Defendants with detailed production, pricing, capacity, raw material, and other information and statistics. The July 2004 issue of this publication included an article on industry price dynamics written by Robert Louw, Senior Vice President of Huntsman. (Upon leaving Huntsman, Mr. Louw joined TZ Minerals International as its senior global pigment advisor in or around April 2005.) That article provided that the "decision to reduce

COMPLAINT
PGDOCS\6589483.3

1  **capacity by both Huntsman and Millennium will possibly impact on future price levels**."

2  Indeed, it did, as the industry announced price increases shortly thereafter to be effective in October

3  2004.

4  **d.      2005 Price Increases**

5  90.      In an article dated February 28, 2005, after the 2004 Fourth Quarter price increases,

6  an industry analyst was reported to say that he "expects 75-85 percent of the increase to get

7  implemented by the end of [the first quarter of 2005]" and that he "expects benchmark pricing in

8  the U.S. to be around $1 per pound once the increase goes through." That prediction proved correct

9  as Defendants and their co-conspirators increased prices four times in 2005. DuPont announced a

10  $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06

11  increase that it had announced in December 2004. There were also U.S. price increases of $0.04 per

12  pound for all grades, effective July 1, 2005 and for $0.06 per pound, effective October 1, 2005.

13  Notably, DuPont's September 2005 announcement (effective in October) was followed by Tronox

14  within a mere seven hours and Kronos within eight hours. Defendant Millennium's Jim Clover sent

15  an e-mail that evening to Gary Cianfichi and others at Millennium, commenting that their

16  competitors' announcements were "too much fun to ignore." Millennium and Huntsman announced

17  price increases the next day. In sum, the North American annual average price per ton of Titanium

18  Dioxide increased by 13 percent (from $1,921 to $2,169) from 2004 to 2005 alone.

19  91.      As in past years, Defendants and their co-conspirators attended a conference in

20  2005, where they were able to meet and discuss price increases that would be announced within a

21  few weeks. In March 2005, a Titanium Dioxide conference was held in Cannes, France. It was

22  attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam Severance),

23  who gave keynote presentations. Fisher later wrote, in an expert report for unrelated litigation, that

24  pigment producers at the conference "discussed the need to take advantage of tight market

25  conditions to improve pricing." He further stated that Defendant Millennium's John Hall "noted in

26  his presentation that the industry should avoid responding to increased demand with 'over-

27

28

investment in capacity' as had happened in the past," suggesting Defendants and their co-conspirators shared pricing information with Fisher as well as each other.

92.     As described below, Defendants had previously increased prices, effective in January 2005. Kronos's Henry Basson telephoned Millennium's Cianfichi and told him that Kronos was "significantly oversold in Europe" and had "no inventory" and that Kerr-McGee was also "oversold" in Europe. Cianfichi then launched an industry price increase and also announced worldwide price increases within weeks of this conference in March 2005 that became effective April 1, 2005. Indeed, around this time, Defendants were announcing price increases every quarter.

93.     At an investor conference in September 2005, Lyondell, which owned Millennium and had an estimated 19 percent of North American capacity at the time, made a presentation noting that there were minimal announced Titanium Dioxide industry capacity additions. The same presentation included a chart that showed annual industry operating rates and overcapacity. According to the chart, the industry operating rate averaged approximately 87 percent in the 2002 to 2005 period, a time when Defendants were announcing price increases nearly every quarter.

94.     After Hurricane Katrina shut down DuPont's DeLisle Plant, Tronox's Vice President of Investor Relations Robert Gibney wrote an e-mail to his colleagues advising "that DuPont would not be 'aggressively pursuing their lost share and will be diligent in bringing the volume back to the market.'" In addition, financial firm JP Morgan reported that the head of DuPont's coating division stated that DuPont would "bring DeLisle up gradually and NOT flood the market with product."

95.     Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices, both in 2005 and in subsequent years, and even at times when demand and consumption were declining in the face of poor economic conditions (*e.g.*, as in 2007-2008). An industry analyst was quoted as saying in November 2005 that DuPont's new capacity would have no problem being absorbed by the market when it eventually came online because pigments would remain "tight" in the future.

COMPLAINT
PGDOCS\6589483.3

Page 25 of 54

### e.  2006 Price Increases

96.    Defendants again increased prices in 2006. For example, Defendants and their co-conspirators announced a $0.05 per pound increase for all grades in North America, effective January 1, 2006. This increase was in addition to the October 1, 2005 increase. An Industrial Minerals International Congress Exhibition was held in San Francisco, California from March 26-29, 2006. Defendants, who likely attended the Exhibition, were in the process of trying to increase prices at this time. Indeed, there was a U.S. price increase of $0.04 per pound for all grades effective June 15, 2006 (DuPont) and July 1, 2006 (Millennium, Tronox, and Kronos). Even though global industry capacity increased from approximately 4 million tons to 5.3 million tons from 2005 to 2006 and industry operating rates were approximately 87 percent in 2006, the North American annual average price per ton of Titanium Dioxide increased from approximately $2,169 to $2,273 from 2005 to 2006, an increase of 5 percent.

### f.  2007 Price Increases

97.    Defendants sought price increases for all grades worldwide in 2007, despite weak demand for Titanium Dioxide in some regions due to declining economic conditions and overcapacity in the market. In the U.S., Defendants and their co-conspirators announced a $0.05 per pound increase effective July 1, 2007 and a $0.06 per pound increase effective October 15, 2007 (or October 17, 2007 in the case of Huntsman). The increases were for all grades. The announcements followed a February 2007 Intertech Titanium Dioxide conference in Fort Lauderdale, Florida where it is believed and alleged that Defendants in attendance, including Vice Presidents from Lyondell and DuPont, were able to meet and discuss said price increases.

98.    On July 9, 2007, Defendant Millennium's Michael Card e-mailed his colleagues complaining that "Millennium's market share was 20 percent in the year to date, while the company's historical share was 21 percent" and asserting that "[w]e should have this extra share—customers have been and want to buy this from us. Competitors will let us have this." However, Millennium's Jim Clover made a handwritten notation reading, "Don't steal Dup tonnes" in November 2007.

99.     Connie Hubbard of DuPont again spoke with Fisher in the summer of 2007 and drafted an entry in DuPont's Competitive Intelligence database noting that Fisher told her, regarding "pricing," that he was "[v]ery confident that Tronox, Kronos, and Huntsman will follow."

100.     In December 2007, Millennium's John Hall e-mailed his colleague Jim Clover and others at Millennium regarding the need to "improve price." Hall responded that Millennium should "[b]e disciplined, keep [its] volume, do not take others." Hall explained at a later deposition that he meant "do not take others" and was referring to the volume of titanium dioxide sales of Millennium's competitors.

### g.     2008 Price Increases

101.     2008 was a banner year for Defendants and their co-conspirators. They announced price increases worldwide for all grades in 2008 on several occasions and also implemented "energy surcharges" for the first time.

102.     On January 7, 2008, DuPont first announced a $0.06 per pound price increase for all grades sold in North America, effective January 15, 2008, stating that the increase was in addition to the $0.06 per pound increase previously announced that was effective October 15, 2007. On the same day, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008.

103.     Tronox's CEO was quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the Ti02 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices." This statement was false and misleading because industry "supply and demand fundamentals" rarely, if ever, explained and supported increased prices during the 2004-2007 time period and because Defendants were at times able to offset increased costs during this period and improve their margins. There was also overcapacity in the industry and flat or weak demand at times during this period, yet, in an uneconomic move, prices were still increased. This statement "was also false and misleading in that it justified increased prices as being based solely

on 'supply and demand fundamentals,'" which did not justify an increase, rather than on Defendants' carefully coordinated and sustained campaign to increase industry prices worldwide.

104.    An Industrial Minerals International Congress Exhibition was held in Athens, Greece from March 30 - April 2, 2008. Defendants, who were in the process of increasing prices at this time, were registered to attend and are believed and alleged to have attended. Shortly thereafter on May 23, 2008, Defendant Kronos announced a $0.05 per pound increase for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound "energy related surcharge" effective June 9, that would be added to all North American invoices for the sale of all Titanium Dioxide products. Kronos stated that the surcharge "represents further implementation of previously announced North American price increases." This was the first time that an "energy surcharge" was announced in the industry.

105.    On Monday, June 2, 2008, DuPont announced that it would increase prices for all grades in all regions, telling customers that they "can expect the rapid implementation of previously announced price increases, additional increases and, in some areas, energy-related surcharges." That same day, DuPont announced a North American price increase of $0.05 per pound, effective June 15, 2008, for all grades, stating that this increase was in addition to the two $0.06 per pound increases in late 2007 and early 2008, which were still "in the process of being implemented." On June 3, 2008, DuPont announced an "energy cost related surcharge" of $0.04 per pound, effective July 1, 2008, for grades of Titanium Dioxide sold in North America to the paper and board industry. DuPont cited the dramatically increased cost of crude oil as an example of an energy cost increase that necessitated the surcharge.

106.    On June 3, 2008, Tronox announced global price increases, stating in its press release that "prices for all TRONOX® titanium dioxide (Ti02) grades sold worldwide will increase by up to 8 percent by July 1." On the same day, June 3, 2008, the Vice President and General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as saying "We expect to increase the global pricing structure by as much as 8 percent in coming weeks." On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase in North America for

all grades. Tronox's increase was effective June 15, 2008 and Millennium's increase was effective July 1, 2008.

107.    Also on June 4, 2008, Huntsman announced "energy related surcharges," including a surcharge of $75 per metric ton for "all sales of imported product into North America." On June 6, 2008, Huntsman announced price increases throughout the world, and on June 9, 2008, Huntsman matched the other Defendants in announcing a North American price increase of $0.05 per pound effective July 1, 2008.

108.    On June 12, 2008, Millennium announced that it would apply "raw material surcharges" to Titanium Dioxide grades sold into the North American paper market of either $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

109.    On June 23, 2008, only three weeks after its June 2, 2008 price increase, DuPont announced another price increase, this time for $0.06 per pound for all grades sold in North America, effective July 1, 2008. This increase was in addition to all previous increases and the paper industry surcharge announced earlier in June.

110.    On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound increase for all grades sold in North America, effective July 1, 2008. The Tronox announcement stated that the "increase is in addition to the price increases announced in October 2007, January 2008 and on June 4, 2008, and is the next step toward partially offsetting the extraordinary increases in freight, energy, and other input costs that the Ti02 industry has absorbed over the last two years." Kronos also announced another $0.03 per pound energy surcharge to be added to all North American invoices, effective July 15, 2008, which would be in addition to the surcharge that became effective on June 9, 2008.

111.    On June 27, 2008, Defendant Huntsman matched DuPont's second increase ($0.06 per pound for all grades in North America effective July 1) and also announced another energy surcharge ($0.03 per pound in North America effective August 1). These increases were in addition to all previously announced price increases as well as the June 4, 2008 surcharge.

112.    On June 30, 2008, Defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America, effective July 1, 2008, which was in addition to its previously announced price increases in North America.

113.    On August 1, 2008, Defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades. Unconscionably, Millennium and Tronox matched DuPont's surcharge increase.

114.    On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America, effective September 1, 2008, or as contracts allowed.

115.    On September 2, 2008, DuPont announced a North American price increase, effective that same day, of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades. Kronos and Tronox matched this increase the next day on September 3, 2008. Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008. The Huntsman increase announcement did not clarify whether this increase (which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

116.    The September 2008 price increases were misleadingly justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year. Defendants' 2007-2008 price increases and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining demand in the paint and construction industries. Titanium Dioxide demand generally had decreased almost 20 percent from 2000-2008 and more than 25 percent from 2004-2008.

117.    In short, over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators uniformly announced three separate

Titanium Dioxide price increases and at least two energy surcharges, in spite of declining demand. The prices of ilmenite and rutile titanium ore, key raw materials for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect between the 2008 price increases and their purported justification.

118.     On December 4, 2008, Defendant Kronos's Joe Maas e-mailed his colleagues about Kronos's November 2008 sales, complaining that the company's sales volume "was the lowest November volume since 1998 and the worst sales volume month since December 2003!" However, Maas went on to write that the "good news" was that Kronos's "average price worldwide increase[d] by 17 US$/MT and we have now realized since May a total average price increase of 205 US$/MT." Maas concluded, "It appears that we and our competitors are prepared to reduce production rather than chase phantom volume."

### h.     2009 Price Increases

119.     In March 2009, Richard C. Olson, vice president and general manager of Defendant DuPont's Titanium Technologies gave the keynote address at IntertechPera's Titanium Dioxide 2009 conference. According to DuPont's website, Mr. Olson "said during the economic downturn the titanium dioxide industry must operate more cautiously, keeping inventory at levels only sufficient to satisfy customer requirements, scrutinizing all capital expenditures and avoiding investment in new capacity without some certainty of a reasonable return." Representatives from Millennium also presented at this conference, and it is believed and alleged that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time.

120.     Following IntertechPera's 2009 conference, Defendant DuPont announced a price increase on May 15, Millennium announced on May 20, Kronos announced on July 10, Huntsman announced on July 15, and Tronox announced on July 17, with each party's increase to take effect on August 1, 2009. Defendants DuPont, Millennium, and Huntsman each increased their prices by $0.02 per pound while Defendant Kronos and co-conspirator Tronox increased their prices by $0.03 per pound.

121.     TZMI hosted another minerals conference in October 2009. David Robb, then Managing Director of Iluka Resources (an Australian mineral company), stated in his opening address, "Industry participants who seek temporary advantage or cash flow through lowering prices in the face of weak demand are confining themselves and their industry to a long and painful recovery process. Of course, we recognize that individual companies will act in what they believe is their own interest, but often that just produces short term gain and long term pain." It is believed and alleged that DuPont and Millennium were both in attendance and that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time.

122.     On December 2, 2009, Kronos's Maas e-mailed a file entitled "R&D Org Chart" to Fisher on December 2, 2009 and warned Fisher, "[P]lease do not copy it verbatim [sic] and screw up a few facts so it does not look like too much inside info." Defendants Kronos and Millennium and co-conspirator Tronox simultaneously announced a price increase of $0.06 per pound one week later, effective January 1, 2010. Huntsman followed suit with an immediate $0.06 per pound increase on January 14, 2010.

### i.     2010 Price Increases

123.     Defendants and their co-conspirators followed up on the January 2010 price increase with a second $0.05 per pound increase, effective April 1, 2010. DuPont led this increase on February 24, and Kronos, Huntsman, Tronox, and Millennium followed on March 3, 9, 10, and 12 respectively.

124.     The 20th Industrial Minerals International Congress & Exhibition was held later in March 2010. It is believed and alleged that DuPont and Millennium were in attendance and that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time. One month after the conference convened, Defendants and their conspirators announced a third 2010 price increase of $0.08 per pound, effective June 1, 2010. DuPont again led the charge on April 30, and Millennium, Kronos, Huntsman, and Tronox followed on May 3, 5, 6 and 17 respectively.

125.    TMZI held its Annual Asia in Focus Congress in Hong Kong from November 3 to 5, 2010. A DuPont representative spoke at the conference, and it is believed and alleged that Defendants and co-conspirators in attendance were able to meet and discuss price increases at or around the same time. One week later, Huntsman announced an $0.08 per pound increase. Kronos, Millennium, Tronox, and DuPont followed with $0.10 per pound price increase announcements on November 15, 24, and 30 and December 3, respectively.

126.    During the Conspiracy Period, price increase announcements for sales in the United States or North America were typically in cents per pound for all grades of Titanium Dioxide sold to all customers for all end-use applications, effective on a particular date. Prices in the United States tended to set a benchmark for prices in other regions worldwide. Price increases in one region were used by Defendants to justify price increases in other regions. Indeed, industry price increases often occurred worldwide in that regional price increases were announced simultaneously or within a month or two of each other. For example, North American price increases typically occurred within a month or two of announcements of price increases in Europe, Asia and other regions. Some of the coordinated price increase announcements of the Defendants and their co-conspirators during the Conspiracy Period are listed by effective date in the following table:

**Examples of Certain U.S. Titanium Dioxide
Industry Price Increase Announcements by
Effective Date in Cent Per Pound**

| Effective Date | DuPont | Millennium | Kronos | Tronox | Huntsman |
|---|---|---|---|---|---|
| | | | | | |
| 03/2002 | $0.05 | $0.05 | $0.03 | $0.05 | $0.05 |
| 07/2002 | $0.06 | $0.06 | $0.03 | | |
| 08/2002 | | | | $0.06 | |
| 10/2002 | $0.04 | $0.04 | | | |
| 02/2003 | $0.06 | $0.06 | | $0.06 | |
| 10/2003 | $0.06 | $0.06 | $0.03 | $0.06 | |
| 03/2004 | $0.05 | $0.05 | $0.05 | | |
| 04/2004 | | | | | $0.05 |
| 06/2004 | $0.04 | $0.04 | | $0.04 | $0.04 |
| 07/2004 | | | $0.04 | | |
| 10/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |

COMPLAINT
PGDOCS\6589483.3

| **Effective Date** | **DuPont** | **Millennium** | **Kronos** | **Tronox** | **Huntsman** |
|---|---|---|---|---|---|
| 01/2005 | $0.06 | $0.06 | $0.06 | | |
| 04/2005 | $0.05 | $0.07 | $0.05 | $0.05 | |
| 07/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/2005 | $0.06 | $0.06 | $0.06 | | $0.06 |
| 01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 06/2006 | $0.04 | | | | |
| 07/2006 | | $0.04 | $0.04 | $0.04 | |
| 08/2006 | | | | | $0.04 |
| 10/2006 | $0.04 | | | | |
| 07/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/2007 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 11/2007 | | $0.06 | | | |
| 01/2008 | | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/2008 | $0.05 | | $0.05 | $0.05 | |
| 07/2008 | $0.06 | $0.05 | $0.06 | $0.06 | $0.05 |
| 08/2008 | | | | | $0.06 |
| 09/2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 01/2009 | $0.04 | | | | |
| 06/2009 | | | $0.04 | | |
| 08/2009 | $0.02 | $0.02, $0.03 | $0.03 | $0.02 | $0.02, $0.03 |
| 10/2009 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 01/2010 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 04/2010 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 06/2010 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 09/2010 | | $0.08 | | $0.08 | $0.08 |
| 10/2010 | $0.08 | | $0.08 | $0.08 | |
| 01/2011 | $0.10 | $0.10 | $0.10 | $0.10 | $0.08 |
| 04/2011 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| 06/2011 | $0.10 | $0.10 | | $0.10 | $0.20 |
| 07/2011 | $0.25 | $0.25 | $0.35 | $0.25 | $0.15 |
| 08/2011 | $0.10 | | $0.10 | | |
| 09/2011 | $0.32 | $0.10 | $0.10 | $0.10 | $0.10 |
| 10/2011 | | | $0.25 | | |
| 11/2011 | $0.15 | $0.15 | | $0.15 | $0.15 |

Sources: Defendants' press releases; 2002-2008 *Chemical Market Reporter, Chemical Week*, and other industry news articles.

127.    All these acts indicate that Defendants were acting pursuant to, and confirming by their acts, an agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Conspiracy Period. Pursuant to the alleged conspiracy, Defendants and their co-conspirators engaged in deceptive behavior including secret discussions about industry pricing,

capacity, costs, and customers, and conspired and agreed to support industry price increase announcements. It is clear that Defendants had achieved a consensus that if they attempted to take significant business or market share from one another on the basis of price (*e.g.*, by "attacking" or trying to "steal" another Defendant's customer with a low-price offer), they risked retaliation from that producer and the potential peril of their own customer accounts, not only in the United States but also around the world, and that they acted to reinforce that consensus. For example, Defendant Huntsman was careful not to appear to compete aggressively for the business of a DuPont customer, lest its own customer accounts then be subject to retaliation from DuPont. Plaintiff alleges that such conduct was not limited to Huntsman but was also practiced by the other Defendants, pursuant to and consistent with an understanding or agreement among DuPont, Millennium, Kronos, Huntsman, and their co-conspirators to keep customer positions and industry prices stable.   Price increase announcements were routinely supported in the industry during the Conspiracy Period, and this consistent conduct in light of Defendants' considerable contacts with each other also gives further support to the allegation that an anticompetitive understanding or agreement existed among Defendants during the Conspiracy Period.

128.    The conspiracy among Defendants was successful in increasing prices during the Conspiracy Period even when industry overcapacity and weak demand existed. For example, in November 2007, Defendant Millennium announced that it was closing a Titanium Dioxide plant in France, in part due to industry overcapacity. As discussed above, Defendants announced worldwide price increases in 2007 and in 2008. Unlike in the 1990s, when market forces caused industry overcapacity to generate lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from appreciably impacting prices during the Conspiracy Period.

129.    Defendants' price increases during the Conspiracy Period had their intended effect, and the alleged conspiracy has been profitable for Defendants. For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately $1,753 in 2002 to $2,273 in 2006, an increase of 30 percent. Defendants Huntsman and Kronos dramatically increased their operating income and margins between 2002 and 2003. Even after discounting the

$142 million in insurance proceeds that Defendant DuPont received for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45 percent from 2002 to 2007. In addition, in 2008 and in spite of declining demand for Titanium Dioxide and recessionary economic conditions in the United States and elsewhere, the global Titanium Dioxide industry earned over $1 billion in pre-tax operating income. Industry leader and Defendant DuPont achieved approximately half of that amount.

## VII.   PLAINTIFF SUFFERED ANTITRUST INJURY

130.   Defendants' combination and conspiracy has had the following effects, among others:

(a)   Price competition in the sale of Titanium Dioxide by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

(b)   Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been unfairly raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

(c)   Defendants charged purchasers of Titanium Dioxide artificially inflated, fixed, and stabilized prices for such Titanium Dioxide;

(d)   Architectural Coatings manufacturers paid an unfairly high price for Titanium Dioxide, which they passed on to Plaintiff;

(e)   Defendants' overcharges passed through each level of distribution as they traveled to Plaintiff and Plaintiff absorbed a significant portion of the overcharge that could not be passed on to its customers due to competitive conditions;

(f)   All persons and entities purchasing Architectural Coatings containing Titanium Dioxide paid Defendants' artificially inflated prices, during the Conspiracy Period, as a result of the Defendants' conspiracy and have been deprived of free and open competition.

131.   During the Conspiracy Period, Plaintiff paid supracompetitive prices for Architectural Coatings containing Titanium Dioxide as a result of Defendants' conspiracy.

132.     The market for Titanium Dioxide and the market for Architectural Coatings are inextricably linked and intertwined.     Architectural     Coatings     manufacturers     consume approximately 41 percent of all Titanium Dioxide. Moreover, there are no viable white pigment competitive substitutes for Titanium Dioxide in the Architectural Coatings industry.

133.     Titanium Dioxide follows a traceable physical chain of distribution from Defendants to Plaintiff. It goes through a single transformation when manufacturers incorporate it into their Architectural Coatings and is a substantial part of those products. Architectural Coatings manufacturers know what percentage of their products is comprised of Titanium Dioxide, and they disclose that percentage on their Material Safety Data Sheets. For example, between 10 and 30 percent (by weight) of certain Behr Premium Plus interior paint is composed of Titanium Dioxide. *See* http://www.homedepot.com/catalog/pdfImages/56/56903928-2eff-4774-ab72-5cd00f82382e.pdf (last accessed Aug. 17, 2016).

134.     The chain of distribution from Defendants to Plaintiff is short. Titanium Dioxide is sold directly to manufacturers of paint such as Behr, who then incorporate it into and sell Architectural Coatings to retailers such as Plaintiff.

135.     Just as Titanium Dioxide can be physically traced through the supply chain, so can its price be traced to show that changes in the prices paid by direct purchasers of Titanium Dioxide affect prices paid by indirect purchasers of products containing Titanium Dioxide such as Plaintiff. Titanium Dioxide is the costliest component of Architectural Coatings such that the retail price of the product is determined in substantial part by the cost of the Titanium Dioxide. Because of the significance of Titanium Dioxide as an input, Architectural Coatings producers are not able to absorb fluctuations in the cost of Titanium Dioxide. As a result, increases in the price of Titanium Dioxide cause increases in the prices of Architectural Coatings containing Titanium Dioxide during the Conspiracy Period.

136.     Raw materials like Titanium Dioxide account for 7 to 13 percent of the cost of Architectural Coating production, and in July 2010, it was reported that paint costs would go up by as much as 5 percent over the rest of that year due to the reduced supply and increased price of

Titanium Dioxide. In November 2011, the cost of paint continued to rise. "Chief executives from US paint and coatings manufacturers Sherwin-Williams and PPG Industries . . . reported frustration about price hikes coming from their customers. The companies [we]re passing on their own price increases in response to continuous rising costs of titanium dioxide."

137.    Analysts reported in 2011 that "TiO2 pigment accounts for 24-25% of the total raw cost to make architectural paint," and Sherwin-Williams' CEO stated that Titanium Dioxide "makes up most of [its] raw material costs." Further, Kronos CEO Steve Watson admitted, while on an earnings call in November 2011, that its customers pass along the higher Titanium Dioxide prices, and he advised investors, "There is no question that an extra $1 for a gallon of paint is not going to destroy demand . . . . I feel our customer base understands and would prefer a higher price than a lack of availability." That same year, Sherwin-Williams announced an eight- to nine-percent increase in prices for Architectural Coatings. *See* http://www.icis.com/resources/news/2011/11/14/9507731/inorganics-us-paint-companies-frustrated- by-continuous-tio2-price-hikes/ (last visited Aug. 10, 2016).

138.    The inflated prices of Titanium Dioxide in Architectural Coatings resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiff and by manufacturers. Those overcharges have unjustly enriched Defendants.

139.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Titanium Dioxide and, as a direct and foreseeable result, the price of Architectural Coatings containing Titanium Dioxide.

140.    Kronos admits that Titanium Dioxide price increases led to "an extra $1 for a gallon of paint." Even without such direct evidence, economists have also developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called a regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs. Thus, it is

possible to isolate and identify only the impact of an increase in the price of Titanium Dioxide on prices for Architectural Coatings containing the chemical even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Titanium Dioxide affects changes in the price of Architectural Coatings containing Titanium Dioxide. In such models, the price of Titanium Dioxide would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Titanium Dioxide impact the price of Architectural Coatings containing Titanium Dioxide while controlling for the impact of other price-determining factors.

141.    The precise amount of the overcharge affecting the price of Architectural Coatings containing Titanium Dioxide can be measured and quantified. Commonly used and well accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiff can be quantified.

142.    By reason of Defendants' illegal, unfair, and anticompetitive conduct, Plaintiff has sustained injury to its businesses and/or property, having paid higher prices for Architectural Coatings containing Titanium Dioxide than it would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, has suffered damages in an amount presently undetermined. Specifically, and by way of example, Plaintiff has suffered during the Conspiracy Period overcharge loss due to unjustified increases in the price of paint containing Titanium Dioxide, as a result of the conspiracy described in this Complaint.

143.    Plaintiff has suffered an antitrust injury of the type that the various laws invoked by this Complaint were meant to punish and prevent, and Plaintiff's damages are measurable.

144.    Plaintiff has standing, and has suffered damage, in California where it resides and operates, compensable by the Cartwright Act, and has sustained significant damage and injury as a result of Defendants' conspiracy.

## VIII. PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A. The Statute of Limitations Did Not Begin To Run Because Plaintiff Did Not And Could Not Discover The Claims.

145. Plaintiff repeats and realleges the allegations set forth above.

146. Under controlling precedent, the applicable statutes of limitations did not begin to run against Plaintiff until at least August 28, 2012 when a class of direct purchasers of Titanium Dioxide was certified by Judge Richard D. Bennett in a separate but related lawsuit brought in the District of Maryland ("Direct Purchaser Litigation"). *See In Re: Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, Memorandum Opinion ("Class Cert. Opinion") D.E. 337, Aug. 28, 2012.

147. Judge Bennett's order conferred judicial legitimacy for the first time on the allegations made against Defendants in that case, accepting as credible nearly all of the findings by direct purchasers' economics expert, Dr. Russell Lamb. He "f[ound] credible Dr. Lamb's conclusions that the Defendants implemented multiple nearly simultaneous price increases throughout the class period, and those price increases can be used to prove coordinated pricing." Class Cert. Opinion at 21. In addition, the court accepted "as established" the "general conclusions that the market for TiO2 is a highly concentrated one," and it "credit[ed] Dr. Lamb's conclusion that $TiO_2$ is a commodity-like product and that competition among producers is based primarily on price." Class Cert. Opinion at 23, 25. Finally, Judge Bennett accepted Dr. Lamb's findings of declining demand and excess capacity after describing his determination "that prices for $TiO_2$ did not fall as economic theory predicts." Class Cert. Opinion at 26.

148. Judge Bennett also found credible Dr. Lamb's findings regarding how Defendants' anticompetitive conduct had common impact on and damaged the direct purchasers, holding that "Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry." Class Cert. Opinion at 33. Dr. Lamb's analysis concluded "that, as a result of the cartel, prices for TiO2 were more than seven percent higher during the Class." Class Cert. Opinion at 32-33. This informed Plaintiff for the first time that Architectural Coatings manufacturers in the United States were damaged, as a whole, by Defendants' anticompetitive conduct.

149.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the very earliest, August 28, 2012, when Judge Bennett entered his class certification order. Until that time, Plaintiff did not have access to Dr. Lamb's report or the evidence he relied on, nor did it have any way to determine the legitimacy of the direct purchasers' allegations against Defendants.

150.    Plaintiff had no direct contact or interaction with any of the Defendants in this case and had no means from which it could have discovered the combination and conspiracy described in this Complaint until the entry of Judge Bennett's class certification opinion.

151.    Prior to the August 2012 certification of a direct purchaser class, facts were not available to Plaintiff that revealed sufficient information to suggest that Plaintiff had a claim against the Defendants. Plaintiff did not have facts or information concerning Defendants' dealings with each other or with direct purchasers of Titanium Dioxide, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged in this Complaint.

152.    For these reasons, the statute of limitations as to Plaintiff's claims did not begin to run and has been tolled with respect to the claims that Plaintiff has alleged in this Complaint.

153.    Even if the filing of the Direct Purchaser Litigation in February 9, 2010 had been sufficient to trigger notice, which it was not, the statute of limitations still has not expired as of the date of the filing of this Complaint as a result of the tolling set out below.

**B.    Fraudulent Concealment Tolled the Statute of Limitations.**

154.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted in this Complaint by Plaintiff. Plaintiff did not know, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy and unlawful combination alleged herein until, at the earliest, the August 28, 2012 entry of Judge Bennett's class certification opinion.

155.    Because Defendants' agreements, understandings, and conspiracies were kept secret and not known to Plaintiff before Judge Bennett's August 2012 class certification ruling, Plaintiff was unaware before that time of Defendants' unlawful conduct, and it did not know before then that

it was paying supracompetitive prices in California and throughout the United States for Architectural Coatings containing Titanium Dioxide during the Conspiracy Period.

156.    The affirmative acts of the Defendants alleged in this Complaint, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

157.    By its very nature, Defendants' and their co-conspirators' alleged price-fixing conspiracy was inherently self-concealing. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the Architectural Coatings manufacturers and other direct purchasers with whom they did business. Plaintiff thus had neither actual nor constructive knowledge of the facts constituting its claims for relief despite diligence in trying to discover the pertinent facts.

158.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws at an earlier date because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

159.    The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods.  Defendants and their co-conspirators are alleged to have affirmatively concealed their conspiracy by meeting secretly to discuss Titanium Dioxide prices, customers and markets; by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; by deceptively giving false and pretextual reasons for price increases, and by describing Titanium Dioxide pricing falsely as being the result of competitive factors rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection. If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and

meetings with each other were also concealed from Defendants' customers and other non-conspirators.

160.    As alleged above, in 2002 after years of declining prices, the price of Titanium Dioxide began to increase. The price increases and "surcharges" implemented by Defendants and their co-conspirators during the Conspiracy Period tended to be based on a need to improve margins, justify future investment, offset increased costs and/or meet allegedly increased demand at a time of tight supply. The justifications offered by Defendants and their co-conspirators for their price increases were false, pretextual and/or misleading and operated to conceal the conspiracy. In fact, price increases were the result of collusive conduct among the Defendants and their co-conspirators, which was undisclosed at the time of the increases. To the extent there was any truth in the explanations offered by Defendants for their numerous price increases during the Conspiracy Period, the explanations were nevertheless misleading because of Defendants' conspiracy, which was kept secret from the public.

161.    For example, in early 2002 when industry prices had hit bottom and Titanium Dioxide producers were desperate to increase prices, they offered a variety of justifications for price increases. Huntsman's Vice President of NAFTA sales was quoted in an article as saying that "recent pricing has been insufficient to justify investments in major new capacity, which will be needed by 2003 to 2004, leading to a tight market at that time." But this was false and misleading because new capacity was in fact not needed. Huntsman and other producers, who successfully increased prices in 2002-2005, actually shut down some capacity during the 2003-2004 period.

162.    Indeed, a lack of new capacity was used at times to justify price increases during the Conspiracy Period, even though Defendants and their co-conspirators often had more than enough capacity (and inventory) on hand to supply global markets. For example, Huntsman and Millennium decreased capacity at certain plants in 2004, and shortly after the October 2007 price increase, Defendant Millennium closed a plant in France citing "the overcapacity of titanium dioxide in the world market," among other reasons.

163.    Often during the Conspiracy Period, Defendants justified the need for price increases due to poor or otherwise "unacceptable" industry margins even though the Titanium Dioxide business of DuPont and other Defendants earned hundreds of millions of dollars in profits annually. For example, in August 2007, DuPont informed customers (even customers who were being supplied by other Defendants) that price increases were justified in part because industry profitability had declined, even though DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45 percent from 2002 to 2007. Also, in 2008, a year in which the paint and plastics industries (which account for approximately 80 percent of Titanium Dioxide consumption) were beleaguered by recession, DuPont, the industry leader, earned over $500 million in pre-tax operating income from global Titanium Dioxide sales.

164.    In addition, when DuPont led an industry price increase in September 2008, its price increase announcement contained various justifications for the increase from its Global Business Director, Ian Edwards. The justifications included not only the existence of higher raw material, energy and transportation costs (which plagued a vast number of industries in 2008), but also the purported fact that "Demand for Ti02 remains strong." This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries. In fact, demand for Titanium Dioxide had been declining for years. For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25 percent between 2004 and 2007.

165.    Although Defendants' price increase announcements during the Conspiracy Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces. Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted.

COMPLAINT
PGDOCS\6589483.3

166.   For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004 stated: "DuPont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global Ti02 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.'" Similar statements were issued by other suppliers.

167.   Huntsman said the price hikes "reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases." These statements were false and misleading because (1) capacity was not "high"—the industry operating rate averaged approximately 87 percent in the 2002-2004 period and (2) ore costs, which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

168.   Defendant's also actively hid the existence of the GSP from the public:

(a)   Millennium's Cianfichi stressed that the GSP was confidential and advised that any references made to the public regarding market details should be described as "[Millennium] estimates and never as CEFIC data";

(b)   Kronos's Basson reminded colleagues that "[a]ny TDMA statistics that are shared with you or any specifics which you may share with your co-workers, should UNDER NO CIRCUMSTANCES BE DIVULGED TO ANY THIRD PARTIES".

169.   Other examples of Defendants' fraudulent concealment include the following:

(a)   Defendants had countless non-public meetings and communications with each other of which Plaintiff was not aware, and Defendants also operated a secret statistics program. TDMA also held a number of multi-lateral meetings for which there are no minutes or notes. The TDMA's "General Committee" or "GC," typically met in person three times a year, and included representatives from Millennium, Huntsman, Kronos and Tronox. Through their representatives, these companies and DuPont also attended annual GSP meetings, usually every January.

(b)     Defendants and their co-conspirators destroyed potential evidence of collusion. As the Titanium Dioxide market was becoming more "uncertain" in 2000—and the Defendants were trying to get customers to accept an industry price increase—Millennium's Bruce Zwicker spoke with Jim Fisher in September 2000 about Kronos. According to an email sent by Zwicker to Cianfichi and other colleagues dated in September 2000, Zwicker learned from Fisher that Kronos was in the process of creating a grade of Titanium Dioxide for sales to paint customers that could compete as a "clone" of Dupont's widely-sold paint grade, R-706. Zwicker concluded the email with the instruction: "Please delete email."

(c)     Fisher testified in a deposition that he never saved e-mail, even after being instructed by direct purchasers' counsel to preserve documents. He further destroyed handwritten notes reflecting knowledge of his conversations with industry personnel. The only notes that remain reflect knowledge of future pricing moved by Defendants.

(d)     In a telephone conversation with a financial consulting firm, Jim Fisher explained that the 60 "published production capacities" of the pigment producers are "far below the real ones," and that DuPont, Millennium, and Kerr-McGee had a total of "350,000 tons of unused capacity."

(e)     Defendants used a "strategy" of providing pretextual explanations for price increases, telling customers that supply was "tight" (despite the existence of secret "unused" or excess capacity) in order to "demand a good price."

(f)     In 2004, Millennium's Cianfichi told customers through a Coatings World article that inventories were low in order to justify a price increase, but he told his staff that inventory was "too high" in North America.

(g)     In 2008, DuPont raised prices in the U.S. and stated in its Customer Communication Plan that "Global demand for TiO2 is expected to . . . increase[,]" whereas an internal DuPont email stated: "The market for TiO2 is more than well supplied, and demand unfortunately [is] very weak in the U.S."

1          (h)    In 2009, a Kronos executive emailed his colleagues about using "plant

2  curtailments" to "scare the hell out of customers about the impending shortage" in order to raise

3  prices.

4         170.    Defendants' customers, including Plaintiff's suppliers, were thus conditioned by

5  experience in dealing with Defendants in what they believed to be a competitive industry to expect

6  price increases from time to time. Plaintiff was lulled into believing that price increases were the

7  normal result of competitive market forces rather than the product of collusive, unlawful efforts.

8  Indeed, as alleged herein, Defendants and their co-conspirators made statements in the media in

9  support of price increases that were presumed to be true and were designed to convince Plaintiff

10  and others to pay purportedly legitimate price increases. Plaintiff is informed and believes, and

11  thereons allege, that Defendants' reasons for the price increases of Titanium Dioxide during the

12  Conspiracy Period were materially false and/or misleading and were made, at least in part, in order

13  to conceal Defendants' anticompetitive scheme as alleged in this Complaint.

14        171.    Judge Bennett found an adequate basis to defeat Defendants' motion for summary

15  judgment based on the statute of limitations in the Direct Purchaser Litigation, citing evidence

16  "suggesting that the Defendants attempted to minimize the appearance of collusion" and "indicating

17  that the Defendants gave inaccurate information to customers in order to justify their price

18  increase." Direct Purchaser Litigation, Memorandum Opinion at 59-60 (D.E. 498 Aug. 14, 2013).

19        172.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

20  the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

21        173.    Because Defendants' agreements, understandings, and conspiracies were both self-

22  concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff had no

23  knowledge of the alleged conspiracy or of any factors or information that would have caused a

24  reasonably diligent person to investigate whether a conspiracy existed. Plaintiff was unaware of

25  Defendants' unlawful conduct, and it did not know before then that it was paying supracompetitive

26  prices in California and throughout the United States for Architectural Coatings containing

27  Titanium Dioxide during the Conspiracy Period.

28

COMPLAINT
PGDOCS\6589483.3

174.    For these reasons, the statute of limitations applicable to Plaintiff's claims was tolled and did not begin to run until August 28, 2012.

## IX.    ADDITIONAL TOLLING OF STATUTE OF LIMITATIONS

175.    The statutes of limitations relevant to Plaintiff's claims were equitably tolled by the doctrine of fraudulent concealment until at least August 28, 2012 as described above.

176.    As a result of the filing of class actions relating to Defendants' and their co-conspirators' illegal conspiracy to fix the prices of Titanium Dioxide and products containing Titanium Dioxide, the statutes of limitation relevant to Plaintiff's purchases of price-fixed Architectural Coatings have also been tolled under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("*American Pipe*"), as well as under the doctrine of cross-jurisdictional tolling.

177.    The statutes of limitations applicable to Plaintiff's Cartwright Act claims for its indirect purchases of Titanium Dioxide and/or Titanium Dioxide Products were tolled as a result of the filing, at least as early as March 15, 2013, of certain indirect purchaser class action complaints against Defendants and their co-conspirators that included Plaintiff in their class definitions and asserted claims against Defendants and their co-conspirators for their participation in the illegal Titanium Dioxide price-fixing conspiracy under various state and federal laws including California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*.

178.    Plaintiff remained in the indirect purchaser class after the First Amended Indirect Class Action Complaint was filed on November 4, 2013. Plaintiff further remained in the indirect purchaser class after the Second Amended Class Action Complaint was filed on October 14, 2014.

179.    Although Plaintiff's claims based on its purchases for resale purportedly were excluded from the indirect purchaser class on September 29, 2015 when the Third Amended Class Action Complaint was filed, Plaintiff remained a part of the putative class as a result of other purchases for its own use and until it indicated its desire to be excluded from the class by filing this action.

# X.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of California's Cartwright Act

180.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

181.    From as early as January 2002 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Titanium Dioxide in unreasonable restraint of trade and commerce and in violation of California's Cartwright Act as set forth below.

182.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    Participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Titanium Dioxide at certain levels, and otherwise fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff with respect to Titanium Dioxide sold in the United States;

(b)    Allocating customers and markets for Titanium Dioxide in the United States in furtherance of their agreements; and

(c)    Participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

183.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Titanium Dioxide.

184.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the Cartwright Act.

185.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

(a)    During the Conspiracy Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described

above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Titanium Dioxide at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Titanium Dioxide.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Titanium Dioxide; and (2) Allocating among themselves the production of Titanium Dioxide.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Titanium Dioxide has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Architectural Coatings containing Titanium Dioxide from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property in that it paid more for Architectural Coatings containing Titanium Dioxide than it otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff seeks treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

1

## SECOND CLAIM FOR RELIEF
### Injunctive and Equitable Relief

2
3
4

186.     Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

5
6
7

187.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

8
9
10
11

188.     At least as early as January 2002, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Titanium Dioxide, thereby creating anticompetitive effects.

12
13
14

189.     The anticompetitive acts were intentionally directed at the United States market for Titanium Dioxide and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Titanium Dioxide throughout the United States.

15
16

190.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Titanium Dioxide.

17
18

191.     As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for Titanium Dioxide.

19
20
21

192.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

22

193.     Defendants' conspiracy had the following effects, among others:

23
24

(a)     Price competition in the market for Titanium Dioxide has been restrained, suppressed, and/or eliminated in the United States;

25
26
27

(b)     Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

28

(c)     Prices for Architectural Coatings purchased by Plaintiff containing Titanium Dioxide manufactured by Defendants and their co-conspirators were inflated; and

(d)     Plaintiff who purchased Architectural Coatings containing Titanium Dioxide indirectly from Defendants has been deprived of the benefits of free and open competition.

194.    Plaintiff has been injured and will continue to be injured in its business and property by paying more for Titanium Dioxide than it would have paid and will pay in the absence of the conspiracy.

195.    Plaintiff will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiff of the benefits of free competition, including competitively-priced Titanium Dioxide.

196.    Plaintiff will continue to lose funds due to overpayment for Titanium Dioxide.

197.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

198.    There being no injunction in force preventing repetition of Defendants' conspiratorial conduct, Plaintiff will face possible future antitrust injury unless this Court enjoins the conduct and all improper information exchanges that facilitated it. Thus, Plaintiff is entitled to an injunction against Defendants preventing them from repeating the violations alleged herein.

## XI.    PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

A.     The unlawful conduct, contract, conspiracy, or combination alleged in this Complaint be adjudged and decreed: an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state and federal antitrust laws as set forth in this Complaint;

B.     Plaintiff recovers damages, to the maximum extent allowed under applicable laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled to the extent such laws permit;

C.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      Plaintiff be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.      Plaintiff recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

F.      Plaintiff has such other and further relief as the case may require and the Court may deem just and proper.

## XII.    JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: August 23, 2016.            Respectfully submitted,

BRYAN CAVE LLP


_____/s/ Thomas S. Lee_____
G. Patrick Watson, Georgia Bar No. 741226
patrick.watson@bryancave.com
Lindsay S. Johnson, Georgia Bar No. 648391
lindsay.johnson@bryancave.com
Thomas S. Lee, California Bar No. 275706
tom.lee@bryancave.com

Attorneys for Home Depot U.S.A., Inc.

COMPLAINT                                                        Page 53 of 54
PGDOCS\6589483.3