G. Patrick Watson, Georgia Bar No. 741226 (*pro hac vice*)
patrick.watson@bclplaw.com
Lindsay S. Johnson, Georgia Bar No. 648391 (*pro hac vice*)
lindsay.johnson@bclplaw.com
Thomas S. Lee, California Bar No. 275706
tom.lee@ bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
Three Embarcadero Center
7th Floor
San Francisco, CA 94111
Telephone:      (415) 675-3400
Facsimile:      (415) 675-3434

Ronan P. Doherty, Georgia Bar No. 224885 (*pro hac vice* forthcoming)
Amanda Kay Seals, Georgia Bar No. 502720 (*pro hac vice* forthcoming)
**BONDURANT MIXSON & ELMORE LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Telephone:      (404) 881-4138
Facsimile:      (404) 881-4111

Attorneys for Plaintiff
HOME DEPOT U.S.A., INC.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HOME DEPOT U.S.A., INC.<br><br>Plaintiff,<br><br>v.<br><br>E.I. DUPONT DE NEMOURS AND COMPANY and MILLENNIUM INORGANIC CHEMICALS, INC.<br><br>Defendants. | Case No. 5:16-cv-04865-BLF<br><br>**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        April 4, 2019<br>Time:        9:00 a.m.<br>Courtroom:   3, 5th Floor – San Jose |

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES ................................................................................. 1

INTRODUCTION ...................................................................................................... 1

ARGUMENT AND AUTHORITIES ......................................................................... 4

I.  The Ninth Circuit's Application of the Summary Judgment Standard in Antitrust Cases is "Quite Different" than what the Third Circuit Has Developed for Oligopoly Cases ............ 4

    A.  Legal Standard for Summary Judgment in Antitrust Cases. ..................... 4

    B.  The Third Circuit applied a Unique Standard at Summary Judgment in *Valspar* .... 5

    C.  The Ninth Circuit Continues to Apply the Rule 56 Summary Judgment Standard in Oligopoly Cases. ......................................... 7

II.  The Factual Record Tends to Exclude Independent Action by the Defendants. ................. 10

    A.  Summary of Key Evidence That Would Allow a Jury to Conclude that the Manufacturers Conspired and Agreed to Raise Prices. ........................... 10

        1.  The conditions were ripe for a price-fixing conspiracy facilitated by the TDMA. ......................................... 10

        2.  The GSP triggered a sudden shift in industry practices. ............................. 11

        3.  The manufacturers coordinated their price increases. ................................. 12

        4.  Meetings and communications between and among manufacturers aided the coordinated price increases. ........................................ 13

        5.  The manufacturers cooperated instead of competed. ................................. 15

        6.  The manufacturers knew their conduct was suspect. ................................. 16

    B.  The District Court of Maryland Correctly Denied Summary Judgment. ................ 17

    C.  This Case is More AnalAgous to *Petroleum Products* than to *Citric Acid*. ............ 17

    D.  The Record Does Not Show Lawful Interdependence. ............................ 19

    E.  Expert Analysis Supports the Inference of a Conspiracy. ........................ 21

CONCLUSION ........................................................................................................ 22

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................5, 7

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................4

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3rd Cir. 2015) ..........................................................................3

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) ................................................................. *passim*

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ....................................................................8, 18

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451, 112 S.Ct. 2072 (1992) .............................................................5

*Fairbanks v. J.C. Penney Corp., Inc.*,
   No, C08-1164-MJP, 2009 WL 2473498 (W.D. Wash. Aug. 7, 2009) ......................20

*In re High-Tech Employee Antitrust Litigation*,
   No. 11-CV-02509-LHK, 2014 WL 1283086 (N.D. Cal. Mar. 28, 2014) .................7

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................3, 5, 6, 9

*McMahon v. Altec Indus., Inc.*,
   No. 3:10-CV-01305-PK, 2012 WL 1597209 (D. Or. Mar. 26, 2012)....................20

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186, 1189 (9th Cir. 2015)............................................................19

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2rd Cir. 2012)...........................................................................16

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).........................................................................20

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997).......................................................................20

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015)............................................................................8, 9

*Theater Enterprises v. Paramount Distributing*,
    346 U.S. 537 (1953) ..........................................................................................19

*In re Titanium Dioxide Antitrust Litig.*,
    959 F. Supp. 2d 799 (D. Md. 2013) .......................................................2, 3, 11, 16

*Valspar Corp. v. E.I. Du Pont de Nemours & Co.*,
    152 F. Supp. 3d 234 (D. Del. 2016) ...................................................................3

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3rd Cir. 2017)................................................................. *passim*

*Wilcox v. First Interstate Bank of Oregon*,
    815 F.2d 522 (9th Cir. 1987)..............................................................................9

**Statutes**

Cal. Bus. & Prof. Code §§ 16700 et seq. ..............................................................1

**Other Authorities**

Fed. R. Civ. P. 56 ...........................................................................................3, 7, 12

Fed. R. Civ. P. 56(a).............................................................................................4

Fed. R. Civ. P. 56(c)(1) .......................................................................................11

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants E.I. DuPont de Nemours and Company and Millennium Inorganic Chemicals, Inc. (together, "Defendants") have moved for summary judgment on the sole ground that the record—including 31 publicly announced and coordinated price increases over 12 years—shows merely follow-the-leader pricing. In addition to urging the Court to apply Third Circuit law, rather than governing Ninth Circuit law, Defendants would have the Court ignore that their own witnesses consistently denied engaging in follow-the-leader pricing. Because Defendants are wrong on the law and wrong on the record, the Court should deny their motion.

<u>STATEMENT OF THE ISSUES</u>

1.      Whether the Ninth Circuit's standard for summary judgment in antitrust cases is different than that in the Third Circuit's *Valspar Corp. v. E.I. Du Pont De Nemours & Co*., 873 F.3d 185 (3rd Cir. 2017) decision.

2.      Whether the evidence is sufficient for a reasonable jury to find that Defendants conspired and agreed to raise the price of titanium dioxide.

<u>INTRODUCTION</u>

Home Depot is an indirect purchaser of titanium dioxide and brings a claim against Defendants for anticompetitive behavior in violation of California's Cartwright Act, California Business & Professions Code §§ 16700 et seq., and a claim for injunctive and equitable relief under federal antitrust laws. Defendants have moved for summary judgment, arguing that the Third Circuit's decision in *Valspar Corp. v. E.I. Du Pont De Nemours & Co*., 873 F.3d 185 (3rd Cir. 2017) is dispositive. Under the governing Ninth Circuit authority, however, the relevant question on Defendants' summary judgment motion is simply "whether all the evidence considered as a whole can reasonably support the inference that [the defendants] conspired . . . to fix prices" for Titanium Dioxide. *In re Citric Acid Litig*., 191 F.3d 1090, 1097 (9th Cir. 1999). If a reasonable jury could conclude that Defendants agreed to fix prices, the Court must deny Defendants' motion. *Id.*

Two district courts have conducted extensive reviews of the underlying factual record and produced conflicting opinions. In the direct purchaser class action, the District Court of Maryland provided a detailed summary of the evidence on which Home Depot relies here. *See In re*

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1

1    *Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 803−819 (D. Md. 2013). That evidence

2    shows that market-leader DuPont joined the Titanium Dioxide Manufacturers Association

3    ("TDMA") following a decade of depressed prices and started sharing highly confidential

4    information within the secretive Global Statistics Program ("GSP"). Almost immediately, there

5    was an abrupt change in behavior from very few coordinated price increases to a series of 31

6    parallel price increases. The record further includes traditional conspiracy evidence, including

7    evidence showing that the manufacturers discussed raising prices at various industry meetings,

8    which often were followed by coordinated price increases. Despite having no valid business

9    reason to do so, the manufacturers publicly announced future price increases well in advance of

10   their effective dates, effectively soliciting the others to raise prices, which they did. The record

11   includes numerous other plus factors, including below market pricing on sales to competitors and

12   mutual protection of each company's market share.

13        Under Fourth Circuit law, the *In re Titanium* court found that this record made for an easy

14   case because it "contains ample evidence for concluding that the Defendants agreed to raise

15   prices." The court further held that "[o]n all points the Defendants' argument fails, as there are

16   genuine issues of material fact to be resolved at the trial of this case" and that a "substantial

17   portion of the evidence" would allow a jury to "permissibly infer a conspiracy. *Id.* at 823.

18        By contrast, the case was much more difficult under Third Circuit law which is "quite

19   different" than the law in the Fourth—and the Ninth—Circuit. *Valspar Corp. v. E.I. Du Pont De*

20   *Nemours & Co.*, 873 F.3d 185, 203 (3rd Cir. 2017). In the *Valspar* litigation, a divided Third

21   Circuit panel affirmed the district court's grant of summary judgment on the same record by a vote

22   of 2−1. *Id.* Defendants now urge this Court to follow *Valspar*, despite the majority's concession

23   that Third Circuit law imposes a far higher burden to avoid summary judgment in oligopoly cases.

24   This Court need not take Home Depot's word on this point because the *Valspar* majority expressly

25   distinguished the *In re Titanium* decision on the governing law:

26        [T]he District of Maryland sits within the United States Court of Appeals for the
         Fourth Circuit. Thus, the Maryland District Court had no obligation to consider
27        Third Circuit precedent, but the District Court in this case was bound by it. This
         resulted in the Maryland court ***applying a standard quite different from the one we***
28        ***have developed*** and that the District Court applied.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1   *Valspar*, 873 F.3d at 202–03 (emphasis added).

2       The district court in *Valspar* similarly explained that Third Circuit law—particularly *In re*

3   *Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3rd Cir. 2015)—compelled summary

4   judgment even though the evidentiary record was the same as *In Re Titanium*. *Valspar Corp. v.*

5   *E.I. Du Pont de Nemours & Co*., 152 F. Supp. 3d 234, 252 & n.10 (D. Del. 2016). On appeal, the

6   *Valspar* majority could not convince the third judge on the panel that its reading of the law was

7   correct, even within the Third Circuit. The dissenting judge observed that the majority's decision

8   "creates an unworkable burden" for antitrust plaintiffs, "not supported by our precedent," and

9   improperly invades the province of the jury. *Valspar*, 973 F.3d at 203. Regardless of whether the

10  case was properly decided under Third Circuit law, this Court need only conclude that *Valspar* is

11  inconsistent with Ninth Circuit law to deny summary judgment here.

12      *Valspar* is at odds with Ninth Circuit law (and likely wrong) because it improperly extends

13  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), to apply a

14  heightened summary judgment standard in oligopoly cases. *Matsushita* involved an implausible

15  conspiracy, which made no economic sense and thus limited the inferences available to the

16  plaintiffs' case.  But the Third Circuit has gone much farther by requiring "inferential modesty" in

17  any and all oligopoly cases—where the economic case for conspiracy is at its most obvious.

18  *Compare Valspar*, 873 F.3d at 192 n.1 *with In re Titanium*, 959 F. Supp. 2d at 824 ("an agreement

19  among the five largest producers of titanium dioxide 'to fix prices at a supracompetitive level …

20  makes perfect economic sense.").

21      *Valspar's* explicit adoption of "inferential modesty" for cases that make all the economic

22  sense in the world is at odds with Rule 56 and Ninth Circuit precedent, which continue to require

23  courts to give a non-moving plaintiff the benefit of any permissible inferences at the summary

24  judgment stage. For instance, *In re Citric Acid Litigation*, a case involving a highly concentrated

25  market, maintains that "the evidence must, on summary judgment, be construed to the greatest

26  extent reasonably possible in favor of finding an antitrust violation[.]" 191 F.3d 1090, 1106 n.10

27  (9th Cir. 1999). That holding is directly at odds with the Third Circuit's decision to deny a

28  plaintiff the benefit of any possible inferences in oligopoly cases.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111–4070

3

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Beyond the legal error and difference in standards, the Third Circuit's "inferential modesty" led the *Valspar* majority to make several mistakes. First, the *Valspar* majority says that in an oligopoly case the plaintiff must have evidence showing an "explicit" agreement to fix prices, because proof of a tacit agreement to fix prices is not enough to overcome the Court's "inferential modesty." 873 F.3d at 193 n.3.  This must be error because a tacit agreement to fix prices remains a *per se* violation of Sherman Act § 1. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Second, as the dissent points out, the *Valspar* majority ignores or dismisses record evidence of plus factors that would allow—and perhaps compel—a reasonable jury to conclude that the defendants had conspired. *Valspar*, 873 F.3d at 207-218. For instance, the *Valspar* majority never acknowledges testimony that "TiO2 producers at the [2005 Intertech] conference ***discussed the need to take advantage of tight market conditions to improve pricing***." *Id.* (emphasis added). That is traditional conspiracy evidence from which a jury could conclude that Defendants agreed to raise prices. Again and again, the *Valspar* majority ignored or explained away the evidence that led the *In re Titanium* court to deny summary judgment.

Third, the *Valspar* majority ultimately affirms summary judgment on the theory that the plaintiffs had no evidence that would tend to exclude the possibility of follow-the-leader pricing even though the court acknowledged that ***all of Defendants' witnesses "denied engaging in 'follow the leader pricing.'"*** *Valspar*, 873 F.3d at n.6 (emphasis added). While Defendants could win summary judgment by showing a plausible and justifiable reason for their conduct, the fact that their witnesses admit that they were not engaged in legal follow-the-leader pricing prevents such a ruling here. The Court should not allow Defendants to win summary judgment based on supposed facts that their own witnesses denied.

<u>ARGUMENT AND AUTHORITIES</u>

I.   <u>The Ninth Circuit's Application of the Summary Judgment Standard in Antitrust Cases is "Quite Different" than what the Third Circuit Has Developed for Oligopoly Cases.</u>

   A.   *Legal Standard for Summary Judgment in Antitrust Cases.*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4

Civ. P. 56(a). And, at summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). However, application of the summary judgment standard in antitrust actions has developed differently across jurisdictions. Defendants' generalizations about the similarities between Ninth Circuit and Third Circuit law are unfounded and expressly contradicted by the very *Valspar* decision on which Defendants so heavily rely. *See Valspar*, 873 F.3d at 192 n.1.

As a starting point, in *Matsushita*, 475 U.S. at 582–97, the Supreme Court held that where a plaintiff alleges a conspiracy in violation of Section 1 of the Sherman Act, it must present evidence which "tends to exclude the possibility" that the alleged conspirators acted independently. *Id.* at 575. Furthermore, "if the factual context renders respondents' claims implausible, i.e., the claims make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary." *Id.* at 587.

The Supreme Court later clarified that *Matsushita*'s requirement "that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468–69, 112 S.Ct. 2072 (1992) (footnote omitted). Moreover, the Supreme Court expressly cautioned that defendants could not win summary judgment merely by citing economic theories, like interdependence:

> The Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

*Id.* at 468–69.

B.     *The Third Circuit applied a Unique Standard at Summary Judgment in* Valspar.

Despite the directives from *Matsushita* and *Kodak*, and contrary to Ninth Circuit precedent, the Third Circuit's *Valspar* decision imposes a unique and higher summary judgment burden on antitrust plaintiffs in oligopoly cases. The *Valspar* majority made clear that the Third

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

Circuit "has developed specialized evidentiary standards at summary judgment in antitrust cases in general and in oligopoly cases in particular." *Id.* at 193. That standard is characterized by "inferential modesty" whereby the court declines to give a non-moving plaintiff the benefit of any permissible inferences at the summary judgment stage.

The Third Circuit recognized that its heightened oligopoly standard "may be a high bar—but it is the bar established by this Court and binding on this panel." *Id.* at 194 n.4. And, the *Valspar* majority admits that its analysis is different from *Matsushita* and unique to the Third Circuit's oligopoly cases:

> As Valspar and our dissenting colleague point out, *Matsushita* involved an alleged conspiracy that did not make 'economic sense,' 475 U.S. at 587, and the Court declined to draw liberal inferences because the defendants 'had no rational economic motive to conspire,' *id.* at 596. While these unlikely to-succeed conspiracies provide one good reason to be circumspect in our inferences, we have explained that oligopolistic interdependence provides another good reason for inferential modesty.

*Valspar*, 873 F.3d 185, at 192 n.1.

The dissent highlights how the majority's reasoning twists the *Matsushita* standard by using so-called "inferential modesty" for oligopoly cases to refuse to "draw any inferences in Valspar's favor." *Id.* at 192 n.1, 204. The *Valspar* majority cites *Matsushita* for the idea that antitrust law limits the permissible inferences from ambiguous evidence because "mistaken inferences are especially costly in antitrust cases, since they could penalize desirable competitive behavior and 'chill the very conduct the antitrust laws are designed to protect.'" *Valspar*, 873 F.3d at 192. That was true in *Matsushita*, where the Court confronted allegations that the defendants had cut (rather than raised) their prices. It is not true for an oligopoly where the market participants have every opportunity and incentive to agree to increase prices. And it is not true in this case, where the evidence shows the manufacturers publicly and privately invited each other to raise prices together and then did raise prices repeatedly. Even the *Valspar* majority conceded that the record included evidence "that something anticompetitive is afoot," 873 F.3d at 200, and acknowledged that its application of "inferential modesty" in oligopoly cases is an "extension of *Matsushita*" that has been criticized "as an unfortunate misinterpretation." *Id.* at 192 n.1. In short, the Third Circuit's approach turns *Matsushita* on its head by making it easier for oligopolists to

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

6

win summary judgment under conditions where an illegal agreement would make the most economic sense.

Furthermore, contrary to *Anderson v. Liberty Lobby*, the *Valspar* judges themselves considered whether the evidence "made a conspiracy more likely than not" instead of assessing whether the *factfinder* at trial could reasonably come to that conclusion. As the dissent lamented, the trial court "weighed and compartmentalized evidence, a task better suited for juries—not judges." *Id.* at 203. Likewise, the *Valspar* majority was selective in its review of the plus factor evidence (seeing "the trees, not the forest") and "gave little weight to the amount of parallel price increase announcements simply because parallel conduct itself is insufficient to create an inference of conspiracy." *Id.* at 205. Now, under *Valspar*, to survive summary judgment using circumstantial evidence in a case involving an oligopolistic market, a plaintiff in the Third Circuit must present "non-economic evidence of an actual agreement"—suggesting that tacit agreement is no longer sufficient to establish an antitrust violation in an oligopolistic market. *Id.* at 213 n.15, 205.

Whatever the law in the Third Circuit, this "high bar" is not the law in this Court, and despite multiple opportunities, neither the Supreme Court nor the Ninth Circuit has created a special summary judgment standard for oligopolistic conspiracies.

C.    *The Ninth Circuit Continues to Apply the Rule 56 Summary Judgment Standard in Oligopoly Cases.*

Unlike the Third Circuit, the Ninth Circuit allows for the (normal) broader summary judgment inferences in favor of a plaintiff who alleges a plausible conspiracy. Following *Matsushita*, the Ninth Circuit considers whether circumstantial evidence "tends to exclude" lawful behavior. The approach has been presented as a two-part test:

> First, the defendant can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.' . . . The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior.

*In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (internal citation omitted).

Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

In other words, "[t]he Ninth Circuit has interpreted *Matsushita* to mean that where a defendant has demonstrated a plausible business reason for its conduct, 'a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must produce evidence tending to exclude the possibility that defendants acted independently.'" *In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK, 2014 WL 1283086, at *1 (N.D. Cal. Mar. 28, 2014) (citing *In re Citric Acid Litig.*, 191 F.3d at 1096). Moreover, in determining whether the evidence "tends to exclude" independent (as opposed to conspiratorial) conduct, the Ninth Circuit (like *Matsushita*) allows for broader inferences in the non-moving party's favor when the plaintiff's claim is a plausible one that makes economic sense. *See Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1089 (9th Cir. 2015).[1]

Unlike the *Valspar* majority, however, the Ninth Circuit has refused to require that a plaintiff's evidence actually persuade the trial court of affirmative liability: "*Matsushita* does not authorize the district court to weigh the evidence and decide which inference is the more plausible one; so long as a particular inference is plausible and permissible under *Matsushita*, it is for the jury to decide whether to draw it." *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 462-63 (9th Cir. 1990). The Ninth Circuit further explained:

> [w]e do not [believe] that a district court may grant summary judgment to antitrust defendants whenever the court concludes that inferences of conspiracy and inferences of innocent conduct are equally plausible. Allowing the district court to make that decision would lead to a dramatic judicial encroachment on the province of the jury. To read *Matsushita* as requiring judges to ask whether the circumstantial evidence is more "consistent" with the defendants' theory than with the plaintiff's theory would imply that the jury should be permitted to choose an inference of conspiracy *only* if the judge has first decided that he would himself draw that inference. This approach would essentially convert the judge into a thirteenth juror, who must be persuaded before an antitrust violation may be found.

*Id.* at 438.  And *In re Citric Acid Litig.*, confirms that Ninth Circuit law continues to require only evidence giving "reasonable support to a finding of conspiratorial . . . behavior" to resist summary judgment. 191 F.3d 1090, 1094 (citation omitted). *Citric Acid* (mistakenly) suggests that other passages in *Petroleum Products* were dicta because that case involved some direct evidence of a

---

[1] Notably, Defendants make no reference to *Stanislaus* in their brief.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

conspiracy (albeit a separate one) rather than a purely circumstantial case. However, nothing in *Citric Acid* suggests that the Ninth Circuit has appointed the Court as the thirteenth juror who must be persuaded to vote for liability to defeat summary judgment.

Most recently, the Ninth Circuit reaffirmed that "context is key" when considering circumstantial evidence of a conspiracy. *Stanislaus*, 803 F.3d at 1089. And repeating *Matsushita*, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.* at 1089 (citing *Matsushita*, 475 U.S. 574, 587). Conversely, a plaintiff pressing a *plausible* claim, like Home Depot here, faces a lesser burden to avoid summary judgment.

While parallel pricing alone may not be dispositive of a conspiracy, "[p]arallel pricing is a relevant factor to be considered along with the evidence as a whole." *In re Citric Acid Litig.*, 191 F.3d at 1102. And, when the evidence as a whole confirms the presence of "plus factors" like "product uniformity, exchange of price information, and opportunity to meet to form anti-competitive policies," *Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522, 525−26 (9th Cir. 1987), and other "[m]arket conditions during a period of alleged collusion," *Stanislaus*, 803 F.3d at 1092, in addition to parallel pricing, the Ninth Circuit permits an inference of conspiracy.

The Ninth Circuit has never adopted a special rule limiting the inferences which may be made in favor of plaintiffs in oligopoly cases. To establish the requisite factual dispute, a plaintiff "must show that the inference of conspiracy is *reasonable* in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Id.* at 1089 (emphasis added).[2] And as the *In re Titanium* court held, Defendants cannot possibly win summary judgment under that standard.

---

[2] Unlike the present case, *Stanislaus* involved an implausible conspiracy and thus the Court drew more limited inferences.

II.       The Factual Record Tends to Exclude Independent Action by the Defendants.

A.       *Summary of Key Evidence That Would Allow a Jury to Conclude that the Manufacturers Conspired and Agreed to Raise Prices.*

Contrary to Defendants' arguments, this case is about much more than just parallel pricing. The record here is replete with evidence, including traditional conspiracy evidence, tending to exclude the possibility that Defendants acted independently when they raised prices together more than 30 times in 12 years.  That is particularly true where the undisputed evidence shows that demand for titanium dioxide was declining and the manufacturers had significant excess production capacity. *In re Titanium Dioxide Antitrust Litig.,* 959 F. Supp. 2d 799, 804, 827 (D. Md. 2013). While the Third Circuit largely ignored this evidence, the *In re Titanium* court noted uncontradicted expert testimony that those economic conditions ordinarily would cause prices to fall. *Id.* Home Depot's theory is that Defendants fought those economic forces by illegally conspiring and agreeing to raise prices.  As *In re Titanium* demonstrates, this case should proceed to trial because that theory is both plausible and supported by record evidence that would allow a jury to find a conspiracy.

1.       The conditions were ripe for a price-fixing conspiracy facilitated by the TDMA.

By the start of the conspiracy period, the Titanium Dioxide industry was in a crisis. *See generally* Declaration of Lindsay S. Johnson in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Johnson Decl."), ¶ 3, Ex. 1, App. M at Entry Dated 08/xx/2001; Entry Dated 04/02/2003). Declining prices and demand in the years leading up to the conspiracy are well-documented in the evidentiary record. Johnson Decl., ¶ 3, Ex. 1, App. M (documenting presentations, reports, e-mails, and articles on the subject of unprecedented declines in price and consumption of titanium dioxide).

Facing this down market and years of falling prices, the TDMA invited DuPont to join the group. The TDMA, as part of the broader European Chemical Industry Counsel ("CEFIC"), had previously denied DuPont admission since it had no European operations. Johnson Decl., ¶¶ 5, 6, Ex. 2, 3. The sudden change in the TDMA's operating rules enabled DuPont to participate in the

10

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

group's new Global Statistics Program ("GSP"). The GSP participants then included DuPont, Huntsman, Kerr-McGee (Tronox), Kronos, and Millennium which, together, accounted for more than 70% of global titanium dioxide production and over 98% of US sales. *See, e.g.*, Johnson Decl., ¶ 3, Ex. 1, App. N at Entry Dated 01/03/2008 (███████████████████████ █████████████████████████████████████). As the largest titanium dioxide manufacturer during the conspiracy, DuPont enjoyed a significant cost advantage over its competitors. Johnson Decl., ¶ 7, Ex. 4 at CIANFICHI00006067.   Rather than use its cost advantage to win business by undercutting the other manufacturers, however, the record shows that DuPont joined the TDMA and coordinated a conspiracy to raise prices for the entire market. *See* Johnson Decl., ¶ 3, Ex. 1, App. R; *see also* Johnson Decl., ¶ 3, Ex. 1, App. O.

The GSP gave these major manufacturers current and more complete information on capacity, demand, and market share than previously available, s*ee* Johnson Decl., ¶ 8, Ex. 5 at MIC0325371; ¶9, Ex. 6 at MIC04280832, enabling the group to better predict *when* they could raise prices and ensure that co-conspirators *actually* raised their prices. As Millennium's Gary Cianfichi explained, █████████████████████████████████████████████████ ████████████████████████████████████████████████████████" Johnson Decl., ¶ 10, Ex. 7; *see also* ¶ 3, Ex. 1, App. P; App. E at Entry Date 09/29/2000, 12/15/2000, 02/09/2001, 03/05/2001, 04/17/2002, 01/06/2006, 04/17/2006, 06/16/2006, 07/09/2007, 01/08/2008, 07/31/2008, 03/09/2009 (documents regarding importance of GSP information).

Although the TDMA's ostensible focus was *technical issues relating to TiO2 production*, the evidence shows the companies often sent *high ranking sales/marketing executives* as their representatives. Johnson Decl., ¶ 11, Ex. 8 at ¶ 38. Millennium's David Vercollone wrote to his colleagues that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████" *See* Johnson Decl., ¶ 12, Ex. 9 at MIC05771277. This evidence would allow a jury to infer that the manufacturers were conspiring to raise prices.

2.       The GSP triggered a sudden shift in industry practices.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Just four days after forming this new alliance, the manufacturers executed the first in an unprecedented series of parallel price increases lasting several years until lawsuits were filed and DuPont exited the GSP.   Johnson Decl., ¶ 3, Ex. 1, App. B (price increase announcement chronology).

This evidence is all the more striking given the additional record evidence that the manufacturers had engaged in very few coordinated price increases in the years that preceded DuPont's entry into the GSP program.   From 1994 through 2001, for example, Millennium's predecessor SCM, Kronos, DuPont, Huntsman, and Tronox engaged in just one parallel price increase. *See* Johnson Decl., ¶ 13, Ex. 10.  During the conspiracy, by contrast, there were 31 parallel price increases announced nearly simultaneously, with identical effective dates, and almost always for an identical amount. Johnson Decl., ¶ 3, Ex. 1, App. B; ¶ 13, Ex. 10 at KROWW00003199.  *See also In re Titanium*, 959 F. Supp. 2d at 809 (noting the "stark contrast" between the few coordinated price increases in the years that preceded the conspiracy and the 25 parallel price increases from 2002−2010). Defendants acknowledge that this change in behavior can support an inference of concerted action, even in an oligopoly. But Defendants argue the change in behavior here is somehow not "radical" or "abrupt" enough to defeat summary judgment. *See* Defs. Br. at 6. This argument reveals the extremity of Defendants' position—and how far from Rule 56 Defendants urge the Court to stray. If the evidence about this change in behavior does not present a classic dispute of fact for a jury to decide, then the law no longer permits jury trials in oligopoly cases.

### 3.   The manufacturers coordinated their price increases.

The record is replete with numerous statements by Defendants evidencing coordinated price increase announcements. *See, e.g.*, Johnson Decl., ¶ 14, Ex. 11 (█████████████████ ████████████████). Furthermore, the price increase announcements often were nearly identical. *See, e.g.*, Johnson Decl., ¶ 15, Ex. 12 (████████████████████████ ██████████████████████). Defendants also coordinated lower production levels. Johnson Decl., ¶ 16, Ex. 13 (███████████████

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

████████████████████████████████████████████████████████████); *see* ¶ 3,

Ex. 1, App. K.

Often it was the coordinated GSP data that led the manufacturers to announce and support

these price increases. ██████████████████████████████████████

████████████████████████████████████████ Johnson Decl., ¶ 17,

Ex. 14. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Johnson

Decl. ¶ 18, Ex. 15. Even when announcements did not come on the heels of a TDMA meeting,

price increase announcements followed one another quickly enough to exclude any claim of

independent analysis. For example, on September 2005, Tronox and Kronos matched a price

increase announcement by DuPont within hours. *See* Johnson Decl., ¶ 3, Ex. 1, App. B at effective

date 10/1/2005. The other producers announced increases the next day. *Id.* Also, the record shows

that throughout the relevant period Defendants repeatedly signaled their intentions to raise prices

by publicly announcing price increases well in advance of the effective date when there was no

valid business reason to do so other than signaling. Johnson Decl., ¶ 19, Ex. 16 (Becker Dep. at

102:5−105:10 (████████████████████████████████████████████

██████████████); ¶ 20, Ex. 17 (Cianfichi Dep. 66:4−14); ¶ 21, Ex. 18 (Rogers Dep.

60:17−61:14); ¶ 22, Ex. 19 (Hartsgrove Dep. at 298:23−99:23). Applying the same standard as the

Ninth Circuit, the *In re Titanium* court held that this was compelling evidence of conspiracy. 959

F. Supp. 2d at 808 ("These instances suggest that the Defendants engaged in little deliberation

before making their pricing decisions."); *see also Valspar*, 873 F.3d at 209.

    4.    Meetings and communications between and among manufacturers aided the

coordinated price increases.

Price increase announcements closely tracked TDMA meetings. *In re Titanium Dioxide*

*Antitrust Litig.*, 959 F. Supp. 2d 799, 830 (D. Md. 2013) ("88 percent of the price increase

announcements . . . came within thirty days of a General Committee meeting of the TDMA, a fact suggesting that the Defendants may have used the TDMA to coordinate price increases.") They also followed other meetings and communications between these supposed competitors. ██████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████  *See* Johnson Decl., ¶ 23, Ex. 20. ██████████████████

██████████████████████████████████████████████

████████████████████████████████  ¶ 24, Ex. 21. This is strong traditional conspiracy evidence from which a jury could infer that Millennium and Huntsman actually agreed to raise prices with other manufacturers.

The manufacturers also urged each other to raise prices and cut capacity through speeches and private communications at industry trade shows, through analysts' calls, and by using industry consultant Jim Fisher as an intermediary. *See generally* Johnson Decl., ¶ 3, Ex. 1, Apps. F1, F2, F3. For example, the record confirms that the manufacturers met and spoke with each other at bi-annual Intertech Titanium Dioxide conferences, attended by top sales/marketing management from the manufacturers. *See* Johnson Decl., ¶ 3, Ex. 1, App. J at 5/21/2001; *see also* Johnson Decl., ¶ 25, Ex. 22 ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████  *See* Johnson Decl., ¶ 26, Ex. 23. ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████  *Id.* ████████████████████████████

████████████████████████████████  *Id.*

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Johnson Decl., ¶ 27, Ex. 24.

*See* ¶ 28, Ex. 25 at TRONOX0000089: *see also, e.g.*, ¶ 3, Ex. 1, App. A (recording industry-wide and multi-lateral meetings of the pigment producers); App. J at Entry Date 05/21/2001, 03/12/2002, 05/01/2002, 12/16/2002, 02/25/2003, 09/15/2003, 02/05/2004, 09/14/2004, 02/xx/2005, 02/03/2005, 09/19/2006, 08/02/2007, 08/25/2007, and 08/29/2007 (noting price signaling by the Defendants). Once again, this is strong traditional evidence that tends to exclude Defendants' claims of wholly independent conduct.

5.      The manufacturers cooperated instead of competed.

Additionally, the record shows that Defendants often avoided competition with each other. For example, the manufacturers sold Titanium Dioxide to each other at discounted (or below market) prices and swapped other raw materials needed for the manufacturing process. *See generally* Johnson Decl., ¶ 3, App. H; Johnson Decl., ¶ 11, Ex. 8 at ¶¶ 77−92; Johnson Decl., ¶ 50, Ex. 47.                                                              Johnson Decl., ¶ 29, Ex. 26. The lack of competition is also evidenced by the manufacturers' response to DuPont's loss of capacity following Hurricane Katrina.

Johnson Decl., ¶ 30, Ex. 27.

Johnson Decl., ¶ 30, Ex. 27; ¶ 31, Ex. 28.

Johnson Decl., ¶ 32, Ex. 29,                                    Johnson Decl., ¶ 33, Ex. 30, and                                    Johnson Decl., ¶ 3, Ex. 1, App. G. at Entry Dated 12/xx/2008 (emphasis in original). Simply put, instead of competing, the competitors helped each other. These admitted efforts to avoid competition so contradict the manufacturers' self-interest

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1  that a jury could infer that they were adhering to an agreement, tacit or express, to avoid

2  competition and keep prices high.

3          6.       The manufacturers knew their conduct was suspect.

4          When they were not meeting, the conspirators in the industry knew enough to be cautious.

5  In fact, TDMA participants lied to keep aspects of the group and its GSP statistics secret.

6  Confirming an incentive to conceal their conduct, Defendants knew that the exchange of such

7  information could run afoul of the antitrust laws. *See* Johnson Decl., ¶ 6, Ex. 3 at MIC0025555.

8  For example, ████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ██████████████████████████████████████ Johnson Decl., ¶ 34, Ex. 31.

14 ██████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ██  *Id.* Cianfichi stressed, ██████████████████████████████████

18 ████████████████████████████ *Id.* ██████████████████████████

19 ████████████████████████████████████████████████████████

20 ███  Johnson Decl., ¶ 35, Ex. 32. The group was adamant about keeping even the GSP's

21 existence and related data secret from customers and most of their own employees. Johnson Decl.

22 ¶ 34, Ex. 31. ██████████████████████████████████████████████

23 ██████████████████████████████ Johnson Decl., ¶ 36, Ex. 33 at MIC0020230.

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████ Johnson Decl.,

27 ¶ 37, Ex. 34; *see also* ¶ 3, Ex. 1, App. E at Entry 9/20/2004; ¶ 38, Ex. 35. The coordinated action

28 of keeping information secret from the manufacturers' customers was anticompetitive and

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

16

facilitated collusion. Johnson Decl. ¶ 11, Ex. 8 at ¶¶ 93−116; ¶ 39, Ex. 36 at ¶¶ 66, 81−83; ¶ 40, Ex. 37 ¶¶ 120−122. And once again, this type of evidence would allow—and perhaps compel—a jury to infer that the manufacturers had entered into an illicit agreement.

B.   *The District Court of Maryland Correctly Denied Summary Judgment.*

On this record, the District Court of Maryland applied the same basic standard the Ninth Circuit uses, namely it considered whether the existence of a conspiracy was a "reasonable inference that the jury could draw from the evidence," and denied the defendants' motion for summary judgment because evidence tended to exclude the possibility of independent action. *See In re Titanium*, 959 F. Supp. 2d at 821 ("[W]here 'a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence.'" (citing *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012))). The Maryland Court recognized that plaintiffs' burden was lighter given the alleged conspiracy's plausibility: "Although it is clear that the *Matsushita* standard governs whether granting summary judgment is proper, it is equally clear that the particular facts of each case determine how high a burden that standard imposes." *Id.* The Court continued, "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury." *Id.* Thus, "when a plausible conspiracy has been alleged, a plaintiff need not "disprove *all* nonconspiratorial explanations for the defendants' conduct" to prevail at summary judgment. *Id.* (citing *Publ'n Paper*, 690 F. 3d at 63) (emphasis added).

To ensure that the evidence did not merely reflect legal conscious parallelism, the District of Maryland required a showing of "plus factors" alongside parallel conduct. After review of the "massive record," the court summarized that "having carefully considered the sheer number of parallel price increase announcements, the structure of the titanium dioxide industry, the industry crisis in the decade before the Class Period, the Defendants' alleged acts against self-interest, and the myriad non-economic evidence implying a conspiracy, this Court finds that the Plaintiffs put forward sufficient evidence tending to exclude the possibility of independent action." *Titanium Dioxide*, 959 F. Supp. 2d at 830; *see* Johnson Decl., ¶ 3, Ex. 1, App. I.

C.   *This Case is More Analogous to* Petroleum Products *than* Citric Acid.

17

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

In addition to *Valspar*, Defendants rely heavily on the facts of *Citric Acid* to support their motion. *Citric Acid* presents an entirely different fact pattern in which the question was whether a single defendant, Cargill, had joined an admitted price fixing conspiracy. 191 F.3d at 1093. In *Citric Acid*, the plaintiffs argued that an industry's trade association, the European Citric Acid Manufacturers Association, served as "a vehicle for conducting illegal conspiratorial activities." *Id.* at 1097. But, the evidence showed that the illegal conduct took place outside those trade association meetings without Cargill's participation. *Id.* at 1106. Because the *Citric Acid* plaintiffs presented few other facts to show Cargill's participation in the trade association implied any illegal activity, the Ninth Circuit held that mere membership in a trade organization is not enough support an inference of conspiracy. *Id.* at 1100. Notably, the case also involved an *implausible* conspiracy, thus resulting in narrower inferences being drawn in the plaintiffs' favor. *Id.* at 1090.

The evidence here is entirely different because there are numerous inculpatory facts that, taken with the TDMA's initial change in operating rules to permit DuPont's entry and its secretive practices, the drastic change in the number of parallel price increases, and the rampant communications and signaling between the manufacturers, among other things, permit an inference of conspiracy. Indeed, the *Valspar* dissent distinguishes the conduct at issue here from that in *Citric Acid* stating, "I agree with the majority that membership in a trade association, in itself, cannot serve as traditional evidence of conspiracy. Nonetheless our task is not to view the TiO2 suppliers' membership in the TDMA in a vacuum. When viewed in conjunction with the other evidence, the membership can be seen in a much different light than *Citric Acid*." *Valspar*, 873 F.3d at 214. The dissent continued:

> For starters, there is evidence here (absent in *Citric Acid*, *Chocolate*, or any other case) of 31 parallel price increase announcements. Nearly all of these announcements came within thirty days of a TDMA meeting. Also absent from *Chocolate* or *Citric Acid* is the presence of an industry consultant (Jim Fisher) who was simultaneously retained by multiple "competitors" to gather pricing information. Obviously, no court could say with certainty that DuPont agreed to fix prices with the other suppliers at the TDMA meetings. But making a judicial determination with certainty is not our job at summary judgment. The point is that, the above evidence, viewed in a light most favorable to Valspar—whose theory makes perfect economic sense—creates an inference of concerted action sufficient to reach a jury.

*Id.* at 213−214.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The *Valspar* dissent further explained that "[i]n *Petroleum Products Antitrust Litigation*, the U.S. Court of Appeals for the Ninth Circuit confronted nearly identical circumstantial evidence of price signaling." 873 F.3d at 214. As in this case, *Petroleum Products* involved companies using unnecessary public price increase letters intentionally and solely to signal to competitors. Like here, the *Petroleum Products* defendants argued that "interdependent pricing constitutes a sufficiently plausible independent explanation for their pricing behavior." 906 F.2d at 443. And like the instant case, *Petroleum Products* involved "a plausible conspiracy theory." *Id.*

In particular, *Petroleum Products* illustrates that early public announcements of price increases support an inference of a conspiracy even in a concentrated industry. After observing that a number of defendants "engaged in the practice of publicly announcing, in press releases, their decisions to withdraw dealer assistance and to restore tankwagon prices" and sometimes did so "in advance of their effective date," the Ninth Circuit held that an inference of conspiracy was "both reasonable and permissible under *Matsushita*." *Id.* at 445. "[V]iewing all of this evidence, a rational jury could conclude that the appellees had agreed to exchange supply and demand forecasts in order to facilitate mutual decelerations of increases in production capacity." *Petroleum Products*, 906 F.2d 432 at 463. Thus, the Ninth Circuit reversed the grant of summary judgment.

D.    *The Record Does Not Show Lawful Interdependence.*

Defendants here argue that "interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." Def. Br. at 9 (citing to *Musical Instruments,* 798 F.3d 1186, 1195). But as in *Petroleum Products*, the record here shows repeated and admitted instances of the conspirators communicating with one another about the need to raise prices, the timing of those increases, and the necessity of limiting capacity and inventory in order to ensure that the price increases stuck. *See* Johnson Decl., ¶ 3, Ex. 1, App. J, App. Q. The record before this Court includes conduct spanning well beyond merely observing and following-the-leader as seen in *Musical Instruments*. 789 F.3d 186, 1194.

On the evidence here, Defendants' repeated advance price increase announcements, speeches at Intertech conferences, and other communications (chronicled above and in the *In re Titanium* and *Valspar* decisions and in the voluminous record) constitute invitations to

19

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

competitors to raise prices. And when the competitors comply by raising prices, that conduct accepts the invitation and forms exactly the kind of tacit agreement the Sherman Act prohibits. *See Theater Enterprises v. Paramount Distributing*, 346 U.S. 537, 540 (1953) ("[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express").

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ Johnson Decl., ¶ 41, Ex. 38 (Maas Dep. 88:1−8 (Kronos)); ¶ 42, Ex. 39 Quinn Dep. 30:12−17 (Huntsman); ¶ 43, Ex. 40 (Rubin Dep. 36:6−11 (DuPont)); ¶ 44, Ex. 41 (Stoll Dep. 47:24−48:7 (Millennium)); ¶ 19, Ex. 16 (Becker Dep. 106:13−17 (Kronos). ███████████

███████████████████████████████████████████ Johnson Decl., ¶ 41, Ex. 39 (Quinn Dep. 28:20−30:17, 61:1−61:4), ¶ 43, Ex. 40 (Rubin Dep. 36:6−36:18), ¶ 19, Ex. 16 (Becker Dep. 106:13−106:17). That price increase announcements came almost simultaneously further supports the conclusion that increases were not a product of competitors analyzing the market independently and reaching the same conclusion. That puts Defendants in the unusual position of arguing that a jury could not possibly credit their own witnesses' testimony and that the Court should render judgment based on a set of supposed facts that the manufacturers' witnesses uniformly denied.

The contradiction between Defendants' testimony and their legal theory ought to preclude summary judgment, just as witness testimony denying an honest belief in the proffered justifications for termination supports an inference of pretext precluding summary judgment in the Title VII context. *See, e.g.*, *McMahon v. Altec Indus., Inc.,* No. 3:10-CV-01305-PK, 2012 WL 1597209, at *10 (D. Or. Mar. 26, 2012), *report and recommendation adopted,* No. 3:10-CV-01305-PK, 2012 WL 1598197 (D. Or. May 7, 2012); *see also Fairbanks v. J.C. Penney Corp., Inc.*, No, C08-1164-MJP, 2009 WL 2473498, at *3 (W.D. Wash. Aug. 7, 2009) (denying summary judgment because defense witness testimony that electrical work was performed by its employee contradicted the defense's legal argument that *res ipsa loquitor* could not apply because it lacked exclusive control of the electrical system). More significantly, the contradiction between the

20

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

proffered "justifiable reason for its conduct that is consistent with proper business conduct" and their own witnesses testimony, means that the record here shows that Defendants "were not engaging in permissible competitive behavior." *Citric Acid*, 191 F.3d at 1094.

E.     *Expert Analysis Supports the Inference of a Conspiracy.*

In addition, Defendants cannot win summary judgment in the face of admissible expert testimony that shows the manufacturers conspired and agreed to raise prices. "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997). While "[a]ssertions in expert affidavits do not automatically create a genuine issue of material fact," the Court is "obligated to look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995). Here, the record includes expert testimony supporting the inference of a conspiracy and creating a dispute of fact. The experts include: Dr. Lamb (direct purchaser class), Dr. McClave (Valspar), Dr. Williams (Valspar), and Dr. Hamilton (direct purchaser class).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. In other words, the market enabled Defendants to successfully inflate prices. Johnson Decl., ¶ 39, Ex. 36 at ¶¶ 19−50; ¶ 40, Ex. 37 ¶¶ 11−25; ¶ 41, Ex. 8 ¶¶ 4−32. The expert analyses also show vast differences in the market before and during the conspiracy. For example, ████████████████████

████████████████████████████████████████████████████████████

███████████████████ Johnson Decl., ¶ 11, Ex. 8 at 12−13. That is evidence that a jury should hear and weigh against Defendants' contrary arguments.

Dr. Lamb analyzed the conspiracy's effect on market prices, and performed a multiple regression analysis to determine whether the rise in prices could be due to competition alone. ████████████████████████████████████████████████████████████

████████████████████████████████ Johnson Decl., ¶ 39, Ex. 36 ¶¶ 59, 117. ██████████

████████████████████████████████████████████████████████████

21

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070



1    ███████████████████████████ *Id.* at ¶¶ 132−139. ████████████████

2    ████████████████████████████████████████ *See* ¶ 40, Ex. 37 at

3    ¶¶ 9, 12; *see also* ¶ 3, Ex. 1, App. D.

4    ██████████████████████████████████████████████

5    ██████████████████████████████████████████████

6    ████████████████ Ex. ¶ 45, 42 at 8−10; *see generally* ¶ 46, Ex. 43. ████

7    ██████████████████████████████████████████████

8    ██████████████████████████████████████████████ Johnson

9    Decl., ¶ 45, Ex. 42 at 8−10, App. A.

10       The record, therefore, includes expert testimony concluding that Defendants' conduct was

11   consistent with coordinated behavior and inconsistent with competition. In reaching this

12   conclusion, for example, ████████████████████████████████████████

13   ████ *See* Johnson Decl., ¶¶ 47−49, Ex. 44, 45, 46. ████████████████

14   ██████████████████████████████████████████████

15   ██████████████████████████████████████ ¶ 48, Ex. 45 at 70−73, App. III.

16   At a minimum, the findings of these experts yield various disputes of fact that only a jury can

17   resolve.

18                              <u>CONCLUSION</u>

19       For the reasons set out above, Home Depot respectfully requests that this Court deny

20   Defendants' Motion for Summary Judgment.

21   Date:  February 6, 2019              Respectfully submitted,

22                                    **BRYAN CAVE LEIGHTON PAISNER LLP**

23

24                                    By:  */s/ Thomas S. Lee*
25                                    Thomas S. Lee
                                      G. Patrick Watson
26                                    Lindsay S. Johnson
                                      Attorneys for Plaintiff
27                                    HOME DEPOT U.S.A., INC.

28

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

22