# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| HOME DEPOT, U.S.A., INC., <br><br> Plaintiff, <br><br> v. <br><br> E.I. DUPONT DE NEMOURS & COMPANY, et al., <br><br> Defendants. | Case No. 16-cv-04865-BLF <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Re: ECF 121] |

This is one of several antitrust cases filed throughout the country based on an alleged price-fixing conspiracy among the major suppliers of titanium dioxide. Plaintiff Home Depot U.S.A., Inc. ("Home Depot") claims that as a result of the alleged conspiracy, it paid supra-competitive prices when it purchased billions of dollars' worth of Architectural Coatings containing titanium dioxide. *See* First Am'd Compl., ECF 70. Home Depot sues Defendants E.I. du Pont de Nemours and Co. ("DuPont"), Millennium Inorganic Chemicals ("Millennium"),[1] Huntsman International, LLC ("Huntsman"), and Kronos Worldwide, Inc. ("Kronos") under federal and state antitrust laws.

All of the titanium dioxide cases share substantially the same record, but summary judgment motions have resulted in opposite rulings. In *Haley Paint*, the United States District Court for the District of Maryland denied the defendants' motions for summary judgment under

---

[1] During the alleged conspiracy period, Millennium was acquired by Cristal USA Inc. The briefing refers to the company interchangeably as Millennium, Millennium/Cristal, and Cristal. For ease reference, this order refers to the company as Millennium.

Fourth Circuit law. *See In re Titanium Dioxide Antitrust Litig.*, 959 F.Supp.2d 799 (D. Md. 2013).[2] In *Valspar*, the United States District Court for the District of Delaware granted the defendant's motion for summary judgment, and was affirmed in a published opinion of the United States Court of Appeals for the Third Circuit. *See Valspar Corp. v. E.I. Du Pont de Nemours and Co.*, 873 F.3d 185 (3d Cir. 2017). Shortly after the affirmance issued, Defendants in the present case obtained leave of court to file an early motion for summary judgment based on *Valspar*. In essence, Defendants ask this Court to break the tie created by the conflicting summary judgment decisions.

Defendants urge the Court to follow *Valspar*, arguing that the legal standards applied by the Third Circuit in that case are identical to those in the Ninth Circuit, and thus the same result is warranted. In opposition, Home Depot disputes Defendants' characterization of the legal standards applied in *Valspar*, asserting that they are very different from those in the Ninth Circuit. Home Depot asks this Court to follow the *Haley Paint* court's lead in denying Defendants' summary judgment motion.

This Court concludes that an antitrust plaintiff's burden to oppose summary judgment under Third Circuit law as articulated in *Valspar* is far more onerous than under Ninth Circuit law. Applying Ninth Circuit precedent interpreting the Supreme Court's seminal decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), this Court finds that Home Depot has demonstrated the existence of triable issues of material fact. Defendants therefore are not entitled to summary judgment, and their motion is DENIED.

**I. BACKGROUND**

The chronology of events underpinning *Valspar*, *Haley Paint*, and the present action is undisputed. The market for titanium dioxide is an oligopoly, meaning that only a few producers account for the bulk of the output. In the 1990s, the titanium dioxide industry suffered declines in consumption and price, and profitability hit an all-time low in 2001. Early in 2002, a trade group founded by the European producers of titanium dioxide – the Titanium Dioxide Manufacturers

---

[2] The parties refer to the case interchangeably as *Haley Paint* and *In re Titanium Dioxide*.

Association ("TDMA") – opened to non-European companies for the first time. TDMA members unanimously agreed to accept DuPont, the largest American supplier of titanium dioxide, on January 24, 2002. Days later, on January 28, 2002, DuPont announced a price increase. Within two weeks, DuPont's announced price increase was matched by TDMA members Millennium, Kronos, and Huntsman.

DuPont was formally approved as a TDMA member in September 2002. At about the same time, the TDMA implemented its new Global Statistics Program, under which each member reported its monthly sales production and inventory figures, which were consolidated into reports for distribution to TDMA members. The Global Statistics Program allowed TDMA members to estimate market shares, inventories, and production for themselves and each other. Over the twelve-year period commencing with DuPont's acceptance for membership in the TDMA and implementation of the Global Statistics Program, DuPont, Millennium, Kronos, and Huntsman announced thirty-one parallel price increases. This was a marked change from the 1994-2001 period, in which Defendants announced only a few parallel price increase.

In 2010, direct purchasers of titanium dioxide filed *Haley Paint* in the District of Maryland, alleging a Sherman Act § 1 claim based on a price-fixing conspiracy among titanium dioxide suppliers. *See Haley Paint*, 959 F. Supp. 2d 799. The district court denied the defendants' motion for summary judgment, after which the case settled. Valspar, a large-scale purchaser of titanium dioxide, opted out of the Maryland action and filed its own suit. On substantially the same record as that before the Maryland Court, the United States District Court for the District of Delaware granted a defense motion for summary judgment, which was affirmed by the Third Circuit. *See Valspar*, 873 F.3d at 190.

Indirect purchasers of titanium dioxide filed suit in the Northern District of California based on the same alleged price-fixing scheme. *See Harrison v. E.I. du Pont de Nemours*, Case No. 13-cv-01180-BLF. The case was assigned to the undersigned and ultimately was resolved pursuant to a class action settlement. The settlement class did not include retailers such as Home Depot.

Home Depot filed the present indirect purchaser action in August 2016, asserting antitrust

3

claims against DuPont, Millennium, Huntsman, and Kronos under the same alleged price-fixing conspiracy. Compl., ECF 1. Huntsman and Kronos have been dismissed pursuant to stipulation of the parties. *See* Order of Dismissal of Huntsman, ECF 68; Order Approving Joint Motion for Order of Dismissal of Kronos, ECF 113. With respect to the remaining defendants, DuPont and Millennium, the operative first amended complaint ("FAC") alleges two claims, the first under California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., and the second under the Sherman Act, 15 U.S.C. § 1. FAC, ECF 70. Defendants DuPont and Millennium now seek summary judgment.

**II. DISCUSSION**

Defendants' motion for summary judgment presents two issues: whether Third Circuit law as articulated in *Valspar* is identical to Ninth Circuit law, and whether Defendants are entitled to summary judgment under Ninth Circuit law. The Court addresses those issues in turn.

**A.** *Valspar* **and Ninth Circuit Law**

In the three decades since the Supreme Court decided *Matsushita*, each of the circuits has developed a set of legal standards to address motions for summary judgment brought in antitrust cases. In *Matsushita*, the Supreme Court held that although the familiar burden-shifting framework of Federal Rule of Civil Procedure 56 applies, and all inferences must be viewed in the light most favorable to the non-moving party, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 587-88. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id*. at 588. "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id*. (internal quotation marks and citation omitted). The Supreme Court made clear that "courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Id*. at 593.

### 1. *Valspar*

The *Valspar* court recited the above holdings of *Matsushita*, and then stated, "[w]ith those principles informing our analysis, this Court has developed *specialized evidentiary standards* at summary judgment in antitrust cases in general and in oligopoly cases in particular." *Valspar*, 873 F.3d at 193 (emphasis added). Because parallel conduct "can be a necessary fact of life" in an oligopolistic market, the court explained, "evidence of conscious parallelism cannot alone create a reasonable inference of conspiracy." *Id*. (internal quotation marks and citation omitted). The court held that "to prove an oligopolistic conspiracy with proof of parallel behavior, that evidence must go beyond mere interdependence and *be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it*." *Id*. (internal quotation marks and citation omitted, emphasis added). "[I]n order to move the ball across the goal line," the plaintiff generally will "need to show that certain plus factors are present." *Id*. (internal quotation marks, citation, and brackets omitted).

Although the Third Circuit has not identified an exhaustive list of plus factors, the *Valspar* court identified three categories of evidence which may qualify: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Valspar*, 873 F.3d at 193 (internal quotation marks and citation omitted). However, the court gave short shrift to the first two categories, stating that "in the case of oligopolies the first two factors are deemphasized because they largely restate the phenomenon of interdependence." *Id*. (internal quotation marks and citation omitted). *Valspar* indicated that courts should focus primarily on the third factor, that is, evidence implying a traditional conspiracy. *Id*. In order to satisfy that factor, *Valspar* stated, the plaintiff must provide "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Id*. (internal quotation marks and citation omitted). The plaintiff may defeat summary judgment *only if*, after evaluating the evidence as a whole, *the court determines that it is more likely than not* that the defendants conspired to fix prices. *Id*. The *Valspar* court acknowledged that it was imposing "a high bar – but it is the bar established by this

5

Court." *Id*. at 194 n.4.

The *Valspar* majority was untroubled by the fact that it granted summary judgment on the same record that led the Maryland court to deny summary judgment in *Haley Paint*, observing that the Maryland court applied Fourth Circuit law, which *Valspar* characterized as "quite different" from Third Circuit law. *Valspar*, 873 F.3d at 203. The dissent, on the other hand, was of the opinion that *Valspar* constituted a grave misstep in Third Circuit jurisprudence. According to the dissent, the majority's ruling created "an unworkable burden, not supported by our precedent, for plaintiffs seeking to prove a Sherman Act price-fixing case with circumstantial evidence." *Valspar*, 873 F.3d at 203. The dissent pointed out that under the majority's holding, "smoking gun" evidence is necessary to survive summary judgment in in oligopoly cases, and district judges are expected to weigh evidence. *Id*. at 203-04. The dissent characterized the majority's approach as a "misapplication of *Matsushita*." *Id*. at 206.

### 2. Ninth Circuit

Like *Valspar*, the lead Ninth Circuit cases addressing summary judgment in the antitrust context recite black letter principles that "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,'" and that the Court must "view the facts and draw factual inferences in favor of" the non-moving party. *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)); *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999). The Ninth Circuit cases also focus on *Matsushita*'s key holdings, reiterating that "to survive summary judgment on the basis of circumstantial evidence, 'a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently,'" *Stanislaus*, 803 F.3d at 1088 (quoting *Matsushita*, 475 U.S. at 588), and "'conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy,'" *Citric Acid*, 191 F.3d at 1094 (quoting *Matsushita*, 475 U.S. at 586).

Beyond those superficial similarities, however, the Ninth Circuit's approach to implementation of *Matsushita* is quite different from that of the *Valspar* court. The Ninth Circuit

6

has articulated a two-part test to be applied when a defendant seeks summary judgment with respect to a § 1 claim that is based on circumstantial evidence. *See Citric Acid*, 191 F.3d at 1094. "First, the defendant can rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Id*. (internal quotation marks and citation omitted). If the defendant makes that showing, "[t]he burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id*.

A defendant may satisfy its burden at step one in a variety of ways. The defendant may show that the allegedly conspiratorial conduct "was in each defendant's *independent self-interest*." *Citric Acid*, 191 F.3d at 1095. Alternatively, the defendant may demonstrate that the potential benefit of the scheme "is just not apparent," such that the defendant's "participation in the alleged conspiracy is economically implausible." *Stanislaus*, 803 F.3d at 1091.

At step two, a § 1 violation cannot be inferred from parallel pricing alone, or from an industry's follow-the-leader pricing strategy. *Citric Acid*, 191 F.3d at 1102. However, "parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable." *Stanislaus*, 803 F.3d at 1092. "[T]he crucial question is whether all the evidence considered as a whole can reasonably support the inference that [the defendant] conspired . . . to fix prices.. *Citric Acid*, 191 F.3d at 1097.

### 3. The Legal Standards are not Identical

Comparing the Third Circuit's standards as articulated in *Valspar* with the Ninth Circuit's standards as articulated in *Stanislaus* and *Citric Acid*, this Court concludes that the standards are not identical. In fact, they are significantly different. The standards articulated in *Valspar* all but eliminate an antitrust plaintiff's opportunity to defeat summary judgment in an oligopoly case based on reasonable inferences arising from circumstantial evidence. Under *Valspar*, certain types of plus factors are discounted and the plaintiff's success turns on its ability to produce "evidence implying a traditional conspiracy," which the majority defined as "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even

though no meetings, conversations, or exchanged documents are shown." *Valspar*, 873 F.3d at 193 (internal quotation marks and citations omitted). As the *Valspar* dissent recognized, this approach appears to require the plaintiff to present "smoking gun" type evidence in order to avoid summary judgment. *Id*. at 203-04. Nothing in the Ninth Circuit's jurisprudence cabins an antitrust plaintiff's ability to defeat summary judgment through circumstantial evidence in this manner.

Nor does Ninth Circuit authority allow, much less require, district judges to weigh evidence. While a plaintiff opposing summary judgment under *Valspar*'s standards must persuade the district court that it is "more likely than not" that the defendants conspired to fix prices, 873 F.3d at 193, in the Ninth Circuit the plaintiff need only present evidence showing "that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Stanislaus*, 803 F.3d at 1089 (internal quotation marks and citation omitted).

The Court notes that the Ninth Circuit's opinion in *Musical Instruments*, cited by Defendants, seems to track language in *Valspar* indicating that certain plus factors, such as motive and conduct contrary to self-interest, should be given little weight in oligopoly cases. *Compare In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194-1195 (9th Cir. 2015), *with Valspar*, 873 F.3d at 193. Defendants point to that fact in support of their position that the legal standards articulated in *Valspar* are identical to those of the Ninth Circuit. As Home Depot notes, however, *Musical Instruments* was decided at the motion to dismiss stage, and it did not address the evidentiary issues critical to determination of a summary judgment motion. Consequently, while *Musical Instruments* is helpful to an understanding of plus factors and how they work in oligopoly cases, this Court looks to *Stanislaus* and *Citric Acid* to determine whether the *Valspar* court applied the same framework on summary judgment as would be applied in the Ninth Circuit. As discussed above. the standards set forth in those cases are different from the standards set forth in *Valspar*.

*Stanislaus*, in particular, emphasized the importance of motive evidence at the summary judgment stage: "The factual context of a claim and the economic plausibility of a defendant's

8

motivation to conspire play an explicit, central role in the standards set forth in *Matsushita*." *Stanislaus*, 803 F.3d at 1090 n.3. "It is an uncontroversial tenet of antitrust law that the clarity and intensity of a motivation may bear on the inferences to be drawn from ambiguous evidence of coordinated behavior." *Id.* (internal quotation marks, citation, and alteration omitted). "Implausible claims require a 'more persuasive' showing 'that tends to exclude the possibility' of independent action. *Id.* at 1089 (citing *Matsushita*, 475 U.S. at 587-88). As the *Valspar* dissent pointed out, the majority appeared to ignore these considerations in its analysis – "Valspar presented an economic theory that makes perfect economic sense, yet the District Court and majority did not draw any inferences in Valspar's favor." *Valspar*, 873 F.3d at 204.

In light of the foregoing, Defendants' motion for summary judgment is DENIED to the extent it is based on Defendants' assertion that Third Circuit law as articulated in *Valspar* is identical to Ninth Circuit law.

**B.     Application of Ninth Circuit's Standards to Facts of this Case**

The Court next considers Defendants' argument that they are entitled to summary judgment under applicable Ninth Circuit legal standards. The standards regarding claims under § 1 of the Sherman Act apply equally to Home Depot's claim under California's Cartwright Act, because the claims under the two statutes are based on the same conduct. *See Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018) ("Where a complaint alleges the same conduct as both a violation of the Sherman Act and a violation of California's Cartwright Act . . . the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not unlawful under the Cartwright Act."); *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 324 F. Supp. 3d 1142, 1156-57 (S.D. Cal. 2018) ("The Cartwright Act is California's equivalent to the Sherman Act, and the analysis under the Cartwright Act is identical to that under the Sherman Act." (internal quotation marks and citations omitted)). Accordingly, while the Court's analysis focuses on Home Depot's claims under § 1 of the Sherman Act, the analysis applies equally to its claims under the Cartwright Act. The parties do not brief the Cartwright Act claim separately or suggest that different standards apply to the federal and state law claims.

9

### 1. Scope of the Record

Before addressing the parties' substantive arguments, the Court addresses the practicalities of working with a voluminous record that has been developed over the course of multiple antitrust cases arising from the alleged price fixing conspiracy. Both sides have submitted declarations of counsel attaching deposition excerpts and other documents which were produced in the earlier actions. *See* Mackowski Decl., ECF 116-3; Anzidei Decl., 116-5; Johnson Decl., ECF 123-1. Home Depot also has filed a Request for Judicial Notice, asking the Court to judicially notice briefing and exhibits filed in *Haley Paint*, *Valspar*, and a case titled *Valspar Corp. v. Kronos Worldwide, Inc.*, (S.D. Tex.), Case No. 4:14-cv-01130. *See* RJN, ECF 123-2.

While the record made available to the Court comprises thousands of pages of documents, relatively few of those documents are actually cited in the parties' briefs. On summary judgment, it is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Californians for Renewable Energy v. California Pub. Utilities Comm'n*, 922 F.3d 929, 935-36 (9th Cir. 2019) (internal quotation marks and citation omitted). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id*. at 936. "Specific citations, not bulk references, are essential to pinpoint key facts and factual disputes." *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1094 (9th Cir. 2015). Accordingly, the Court has considered only those documents cited in the briefing, and only those portions of documents that are pin-cited or otherwise identified with particularity, "without mining the entire document for more substantiation." *Id*.

Moreover, with respect to Home Depot's request for judicial notice, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Thus, while it may be able to take judicial notice of the existence of any number of documents in the record, the Court cannot take judicial notice of the contents of such documents unless they comprise facts which are "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id*.

### 2. Analysis

A plaintiff asserting a claim of concerted price fixing under § 1 of the Sherman Act bears the burden of proving that an agreement to fix prices existed. *See Citric Acid*, 191 F.3d at 1093. Where, as here, the plaintiff seeks to prove the conspiracy with circumstantial evidence, a two-part test applies to a defense motion for summary judgment. *See id.* at 1094. "First, the defendant can rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Id*. (internal quotation marks and citation omitted). If the defendant makes that showing, "[t]he burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id*. Summary judgment will be denied if "the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Stanislaus*, 803 F.3d at 1089 (internal quotation marks and citation omitted).

#### a. Step 1

Home Depot's theory is that the thirty-one parallel price increase announcements by DuPont, Millennium, Kronos, and Huntsman were the product of a conspiracy to fix prices. Defendants argue that those price increase announcements were not the product of a conspiracy, and that each company chose to announce price increases when it did based on the company's independent judgment.

Defendants submit the deposition testimony of DuPont senior executives, who described their process for analyzing market supply and demand, costs, company strategies, and goals when deciding whether to implement a price increase. *See* Mackowski Decl. Exh. 1, Gallagher Dep. 233:2-236:23, ECF 116-3; Mackowski Decl. Exh. 2, Rubin Dep. 32:4-33:9, ECF 116-3. Defendants also point to documents which support the DuPont executives' version of events. *See* Mackowski Decl. Exhs. 3-6, ECF 116-3. With respect to Millennium, Defendants submit the deposition testimony of a vice president, explaining Millennium's process in deciding whether to announce a price increase. *See* Anzidei Decl. Exh. 1, Hall Dep. 78:2-10, ECF 116-5. Defendants also cite to expert reports that were produced in *Haley Paint*, showing that the number of days it

took Millennium to announce a price increase following a competitor's announcement varied over the course of the alleged conspiracy. *See, e.g.,* Anzidei Decl. Exh. 2, Hamilton Report at App. B1, ECF 116-6. Millennium also submits evidence that at times it undercut competitor's prices to increase its sales. *See* Anzidei Decl., Exhs. 9-12.

A trier of fact could conclude, based on this evidence, that Defendants' announcements of price increases were based on independent internal deliberations rather than an agreement to fix prices. The Court therefore concludes that Defendants have satisfied their step 1 burden. The burden therefore shifts to Plaintiffs, at step 2 of the test, to provide specific evidence tending to show that Defendants were not engaging in permissible competitive behavior.

### b. Step 2

#### i. Plausibility

Home Depot begins by arguing that its price-fixing claim is plausible, noting that the *Stanislaus* court found context to be "key" when evaluating whether an antitrust plaintiff has presented evidence sufficient to raise a reasonable inference of anticompetitive conduct. "The factual context of a claim and the economic plausibility of a defendant's motivation to conspire play an explicit, central role in the standards set forth in *Matsushita*." *Stanislaus*, 803 F.3d at 1090 n.3. "Implausible claims require a 'more persuasive' showing 'that tends to exclude the possibility' of independent action." *Id*. at 1089 (citing *Matsushita*, 475 U.S. at 587-88).

It is undisputed that at the start of the alleged conspiracy period, the titanium dioxide industry had suffered significant declines in demand and profitability, and that prices were at a low. At that point, the TDMA for the first time permitted an American supplier – DuPont – to join. Within weeks, the first of the thirty-one parallel price increase announcements occurred, and the alleged conspirators continued to announce price increases in parallel over the next decade. In this factual context, Home Depot's theory that the major suppliers of titanium dioxide agreed to fix prices for their mutual benefit is entirely plausible. That fact was recognized by both the *Haley Paint* court, which commented that "an agreement among the five largest producers of titanium dioxide to fix prices at a supracompetitive level . . . makes perfect economic sense," *Haley Paint*, 959 F. Supp. 2d at 824 (internal quotation marks and citation omitted), and the *Valspar* dissent,

which observed that "Valspar presented an economic theory that makes perfect economic sense," *Valspar*, 873 F.3d at 204.

### ii. Parallel Conduct

Next, Home Depot points to the abrupt change in industry practice, from the pre-2002 period in which there were only a few instances of parallel price increase announcements, to the thirty-one instances of parallel price increase announcements in the twelve years following the TDMA's agreement to allow DuPont to join. *See* Johnson Decl. Exh. 1, App B (price increase announcement chronology), ECF 122-7.[3] While some of the parallel announcements were days or even weeks apart, they generally occurred in lockstep. Thus, even taking into account variations in timing, the sudden jump from only a few parallel price increase announcements prior to 2002 to *thirty-one* during the alleged conspiracy period is startling. Defendants' characterization of the industry change as "[a] mere uptick in the frequency of price announcements" is unpersuasive. *See* Reply at 8, ECF 133. As the *Valspar* dissent recognized, "[t]he sheer number of parallel price increase announcements in this case – 31 to be exact – is unprecedented," and "would undoubtedly raise red flags to any reasonable fact finder." *Valspar*, 873 F.3d at 205. The *Haley Paint* court similarly characterized the parallel price increase announcements as "noteworthy, because they were so pervasive." *Haley Paint*, 959 F. Supp. 2d at 825.

While parallel conduct is insufficient on its own to give rise to an inference of conspiracy, it is "a relevant factor to be considered along with the evidence as a whole." *Citric Acid*, 191 F.3d at 1102. "[I]f there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable." *Id.* It is against this backdrop of a plausible claim coupled with a sudden pattern of prolonged parallel price announcements that this Court must determine whether Home Depot has

---

[3] The cited evidence is an appendix submitted by the plaintiffs in *Haley Paint*, setting forth the chronology of price increase announcements. The Court may take judicial notice of the appendix as a court record. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."). As noted above, the fact that the document itself is subject to judicial notice "does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. The Court finds it appropriate to accept the truth of the chronology here, because it is not challenged by Defendants and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id*.

13

presented sufficient plus factors to render the inference of a price-fixing conspiracy reasonable when held up against competing inferences of independent action. *See Stanislaus*, 803 F.3d at 1089.

### iii. Motive

Home Depot presents expert evidence that Defendants had motive to enter into a price-fixing conspiracy. The titanium dioxide market is highly concentrated; titanium dioxide is a commodity-like product with no substitutes; and there are substantial barriers to entry in the market. *See* Johnson Decl. Exh. 36, Lamb Report at 11-30, ECF 122-59. Consequently, the structure of the titanium dioxide market was conducive to a price-fixing conspiracy. *See* Johnson Decl. Exh. 8, Hamilton Report at 3-4, ECF 122-31; Johnson Decl. Exh. 36, Lamb Report at 11-30, ECF 122-59. Both the Third Circuit in *Valspar*, and the District of Maryland in *Haley Paint*, concluded that these conditions established the existence of motive, and Defendants do not dispute that conclusion. *See Valspar*, 873 F.3d at 197 ("There is little doubt that this highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing."); *Haley Paint*, 959 F. Supp. 2d at 826 ("In this case, the first plus factor is satisfied. The structure of the United States titanium dioxide market is conducive to price-fixing, based on multiple factors.").

The Ninth Circuit has made clear that in oligopoly cases, "alleging 'common motive to conspire' simply restates that a market is interdependent (*i.e.*, that the profitability of a firm's decisions regarding pricing depends on competitors' reactions)." *Musical Instruments*, 789 F.3d at 1195. "Interdependence, however, does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *Id*. "[O]ne firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit." *Id*. "By that process ('follow the leader'), supracompetitive prices and other anticompetitive practices, once initiated, can spread through a market without any prior agreement." *Id*. Such conduct – either raising prices or following suit – is not a violation of antitrust laws when it is merely an example of the "conscious parallelism endemic to an oligopoly." *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018).

The thirty-one parallel price increase announcements certainly could be explained by follow-the-leader pricing. Indeed, the *Valspar* court concluded that conscious parallelism was the only reasonable inference to be drawn from the record evidence, concluding that there was insufficient evidence of conspiracy and that DuPont could not argue with a straight face that the competitor's decisions to raise prices were discrete events. *See Valspar*, 873 F.3d at 195. However, Home Depot submits testimony from representatives of DuPont, Millennium, Huntsman, and Kronos, expressly *denying* that the companies engaged in follow-the-leader pricing. *See* Johnson Decl. Exh. 40, Rubin Dep. 36:6-11 (DuPont); Johnson Decl. Exh. 41, Stoll Dep. 47:24-48:7 (Millennium); Johnson Decl. Exh. 38, Maas Dep. 88:1-8 (Kronos); Johnson Decl. Exh. 39, Quinn Dep. 30:12-17 (Huntsman). DuPont, Kronos, and Huntsman representatives denied even considering a competitor's price announcements when determining the company's own price announcements. Johnson Decl. Exh. 40, Rubin Dep. 36:6-18 (DuPont); Johnson Decl. Exh. 16, Becker Dep. 106:13-17 (Kronos); Johnson Decl. Exh. 39, Quinn Dep. 28:20-30:17, 61:1-4 (Huntsman). At the hearing, Home Depot's counsel made the point that "it's hard for the defendants to even argue that this is legitimate follow-the-leader pricing if their own witnesses are denying it." Tr. 53:5-54:7, ECF 145.

While Defendants argue that the evidence of motive may be dismissed as equally consistent with the conscious parallelism expected in an interdependent market, the alleged conspirators' denials of follow-the-leader pricing – or even consideration of competitors' pricing – gives rise to a reasonable contrary inference that Defendants did not act independently but rather in concert.

*iv.    Actions Against Self-Interest*

Home Depot also points to evidence that the alleged conspirators took actions against their economic self-interest. For example, they sold titanium dioxide to each other at below market prices and swapped raw materials needed for manufacture, conduct that normally would not be expected between market rivals. *See* Johnson Decl. Exh. 8, Hamilton Report at 28-33, ECF 122-31; Johnson Decl. Exh. 44, Williams Report at 49-59, ECF 122-66. Millennium's John Hall referred to this conduct as "co-opertition." Johnson Decl. Exh. 26, Hall email, ECF 122-49.

15

When DuPont shut down one of its plants in 2005 after Hurricane Katrina, DuPont announced that it would bring the plant back online slowly and would "NOT flood the market with product," and would "not be aggressively pursuing their lost share" of the market. *See* Johnson Decl. Exh. 27, email, ECF 122-50. It is not clear why DuPont would not have attempted to recover its market share. However, internal Millennium emails and notes from a later timeframe show that, at least in 2006-2008, Millennium consciously avoided competition with DuPont. *See, e.g.,* Johnson Exh. 29, email ("we do not want to be disruptive to DuPont"), ECF 122-52; Johnson Exh. 30, handwritten note ("Don't steal Dup tonnes").

The alleged conspirators also shared confidential and commercially sensitive information through the TDMA and its Global Statistics Program. *See* Johnson Decl. Exh. 9, ECF 122-32. The *Haley Paint* court found evidence regarding the Global Statistics Program suggestive of collusion, citing authority that "knowledge of market share is the most important information to sustain a conspiracy." *Haley Paint*, 959 F. Supp. 2d at 828.

Defendants argue that participation in the Global Statistics Program was entirely legal, and that a decision to avoid undercutting a competitor's prices may be a natural consequence of interdependence rather than the result of collusion. Defendants point out that the described conduct allowed the titanium dioxide producers to "in effect share monopoly power and maintain prices at a profit-maximizing supracompetitive level" without necessarily evidencing an express agreement to do so. Reply at 10, ECF 133 (internal quotation marks and citations omitted). While the Court agrees that the alleged conspirators' conduct may be explained in such a fashion, Home Depot presents expert evidence that the rise in prices of titanium dioxide during the alleged conspiracy period cannot be explained by competition alone. *See* Johnson Decl. Exh. 36, Lamb Report at 56, ECF 122-59; Johnson Decl. Exh. 42, McClave Report at 10, ECF 122-64; Johnson Decl. Exh. 43, McClave Rebuttal Report at 3, ECF 122-65. The Court concludes that Home Depot's evidence, as placed in context by the expert reports, gives rise to a reasonable inference that Defendants' actions against self-interest were pursuant to a price-fixing conspiracy.

*v.  Evidence Implying a Traditional Conspiracy*

Home Depot also presents evidence implying a traditional conspiracy. Following a

meeting between senior executives of Millennium and Huntsman in Baltimore on September 13, 2004, Millennium sent colleagues an email stating: "now that we have competition on board for the Oct 1 price increase announcement, please relook at your agents [sic] commissions." Johnson Decl. ¶¶ 23-24 & Exhs. 20-21, ECF 122-43, ECF 122-44.

Other evidence suggests more indirectly that DuPont, Millennium and others were using Intertech conferences and speeches to meet with each other and communicate about parallel pricing. For example, Millennium's Mr. Zwicker commented that Intertech conferences were a "great place for . . . side meetings," and DuPont's Mr. Edwards indicated in an email that while his written materials for Intertech were "fairly cautious," he was "more direct" in his verbal presentations. *See* Johnson Decl. ¶¶ 25-26 & Exhs. 22-23, ECF 122-45, ECF 122-46. Jim Fisher, an industry consultant, testified that at the 2005 Intertech conference the titanium dioxide producers "discussed the need to take advantage of tight market conditions to improve pricing." *See* Johnson Decl. ¶ 28 & Exh. 25 at TRONOX0000089, ECF 122-48. Mr. Fisher's statement would appear to carry significant weight given that he appears to have "communicated contemporaneously with people from Kronos, Millennium, Huntsman, and DuPont" during the conspiracy period. *See Valspar*, 873 F.3d at 215. Indeed, Home Depot suggests that Mr. Fisher may have been used as an intermediary by the alleged conspirators.

Defendants contend that Home Depot's evidence does not show any "direct communications about pricing between any alleged conspirators," and "falls far short" of tending to exclude the possibility of independent action. Reply at 9, ECF 133. While the Court agrees that the evidence does not establish direct communications about pricing, the Court also agrees with the *Haley Paint* court that evidence regarding the alleged conspirators' communications, is "the kind of circumstantial evidence that, when viewed in conjunction with the massive record in this case, could lead a jury to reasonably infer a conspiracy in restraint of trade." *Haley Paint*, 959 F. Supp. 2d at 830.

*vi.     Conclusion*

Viewing this record as a whole, the Court concludes that, under Ninth Circuit standards as articulated herein, Home Depot has presented evidence from which a reasonable trier of fact could

17

conclude that the thirty-one parallel price increase announcements were the product of a price-fixing conspiracy rather than lawful market activity to be expected in an oligopoly. In reaching that conclusion, the Court has considered the context and plausibility of Home Depot's claim; the startling number of parallel price announcements during the alleged conspiracy period in contrast to the pre-conspiracy period; the testimony of the alleged conspirators' representatives which appear to negate a follow-the-leader explanation for the parallel price announcements; the alleged conspirator's "co-opertition," rather than competition, with each other; and the internal email evidence implying a traditional conspiracy. This evidence renders the inference of a price-fixing conspiracy reasonable, even considering the nature of an oligopolistic market and competing inferences of independent action. *See Stanislaus*, 803 F.3d at 1089.

This Court's view of the evidence was shared by the *Valspar* dissent, which – albeit under different legal standards – concluded that the question of whether Defendants' parallel conduct "was a lawful coincidence or an unlawful agreement should be decided by a jury." *Valspar*, 873 F.3d at 203; *see also Haley Paint*, 959 F. Supp. 2d at 830 ("Having carefully considered the sheer number of parallel price increase announcements, the structure of the titanium dioxide industry, the industry crisis in the decade before the Class Period, the Defendants' alleged acts against their self-interest, and the myriad non-economic evidence implying a conspiracy, this Court finds that the Plaintiffs put forward sufficient evidence tending to exclude the possibility of independent action.").

### III. ORDER

(1) Defendants' motion for summary judgment is DENIED; and

(2) This order shall be conditionally filed under seal. The parties shall meet and confer regarding proposed redactions to the order before it is filed in the public docket, and shall submit agreed-upon proposed redactions to the Court on or before August 2, 2019.

Dated: July 22, 2019

BETH LABSON FREEMAN
United States District Judge

18